UNITED STATES of America, Appellee,

v.

Paul W. BOTSCH, Jr., Appellant.

No. 432, Docket 30297.

United States Court of Appeals Second Circuit.

Argued June 3, 1966.

Decided Aug. 1, 1966.

J. Joseph Smith, Circuit Judge, dissented.

issue of Dispatch's standing to bring the suit.

Solomon Z. Ferziger, Brooklyn, N. Y., for appellant.

George L. Barnett, Asst. U. S. Atty., Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty. for Eastern District of New York, Jerome C. Ditore, Asst. U. S. Atty. on the brief), for appellee.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

Paul W. Botsch, Jr. appeals from a judgment of conviction on thirteen counts of violating 18 U.S.C. § 1341 (using the mails in a scheme to defraud) and on one count of violating 18 U.S.C. § 1342 (assuming a fictitious name or address to promote a scheme). Judge Dooling, who presided at Botsch's jury trial, imposed concurrent sentences of six months' imprisonment followed by eighteen months' probation on each count. For the reasons set forth below, we affirm.

## I.

Because Botsch challenges the admissibility of certain evidence obtained by searches which he contends were unreasonable and, hence, violative of the Fourth Amendment, it is necessary to set forth in detail not only the factual material presented at trial which the jury was warranted in crediting but, in ad-

dition, the circumstances which led to the procurement of the controverted evidence. The record discloses that, in 1962, Botsch and two friends, Harold Switts and Richard A. Boyce, Jr., opened a retail sporting goods enterprise known as "Olympic Arms" [1] in Huntington, New York. Because of previous financial difficulties, Botsch avoided being designated an officer of the company; he, nevertheless, undertook full management of the business and placed most of the orders for merchandise. Switts spent little time in the store, and Boyce, the company's nominal president, played only a slightly more active role.

Shortly after the Olympic Arms store commenced operations in Huntington, Botsch rented a small shack located at the Fire Island Ferry Station in Sayville, New York. This wooden shanty, measuring a bare 10 x 20 feet with one window, was leased from Kenneth Stein,[2] who operated the ferry and managed the ferry station, at a monthly rental of $25. Indeed, the shack, at one time, had been used as the ferry terminal office.

In addition to making these premises available, Stein, at the request of Botsch, agreed to perform certain services. Since Botsch stated that he expected parcels to be shipped to the shanty, he asked Stein, who Botsch knew had retained a key, to unlock the shack in order to permit delivered merchandise to be stored inside and also to sign any required receipts. Moreover, Botsch gave Stein $100 in cash to be used in payment of freight charges. Stein, at the trial, testified that he performed these functions and that Botsch, almost daily, came to the shanty, picked up the accumulated deliveries and replenished the cash fund so that, at all times, it would be maintained near the $100 level. Stein also stated that Botsch placed a sign on the shanty which read "Lands End Supply Co., Division of Fisherman's Paradise." [3]

In October 1962, an order for merchandise under the letterhead "Lands End Sports Shop (Division of Fisherman's Paradise *Inc.*), River Avenue at Lands End, Sayville, New York" (emphasis added) was dispatched to Wightman Electronics Inc., Easton, Maryland. It read:

> Gentlemen:
> Please send us 1 (one) Call of the Wild record machine and 1 each of the different game records for the machine.
> References other than D[un] & B[radstreet] supplied upon request.
> Thank you in advance,
> /s/ C. Sampos
> C. Sampos

Orders for sporting mechandise, on similar stationery and bearing a similar signature,[4] were also dispatched in October to "Bushnell," Pasadena, California; "R. C. B. S.," Oroville, California; "Original Sight Exchange," Paoli, Pennsylvania; "P. S. Olt Co.," Pekin, Illinois; "Paul Jaeger," Jenkintown, Pennsylvania; and "Division Lead Company," Summit, Illinois.[5] Each company filled the order received by it, shipped goods to Sayville and, it may be inferred, relied on the Dun & Bradstreet credit rating for another "Fisherman's Paradise," enterprise in Sayville, New York.

The ingenious nature of the scheme becomes apparent when we learn that the reference to "Fisherman's Paradise" in Dun & Bradstreet was not to the mail or package drop which Botsch maintained in Sayville. Instead, the listing referred to an unincorporated and wholly unrelated sporting goods enterprise which had been owned and operated by one Christopher Locascio in Sayville for more

---

1. Although the parties referred to the store as "Olympic Arms," it appears that its full name was "Olympic Arms, Division of Precision Firearms Company."

2. The premises were actually held in Stein's wife's name, but Stein was in active control at all pertinent times.

3. Other witnesses testified that the sign merely read, "Lands End Sport Shop."

4. Some of the orders were signed "C. Santos" rather than "C. Sampos."

5. Other companies were also involved but this list suffices to show the geographic range of Botsch's activities.

than 8 years under the tradename "Fisherman's Paradise." Indeed, it appears that prior to November 1962, a "comedy of errors" caused Locascio to suspect that something was amiss; he was receiving packages addressed to Lands End Sports Shop—Fisherman's Paradise which he had never ordered. After making some inquiries, Locascio learned that Botsch had rented the shanty in controversy from Stein and that the premises were being used to receive goods which ostensibly were ordered and being shipped on Locascio's credit. Angered by all this, Locascio communicated with Botsch and complained bitterly about the scheme, even uttering threats if Botsch did not discontinue this deceit. Botsch, however, vigorously denied any participation in the Lands End Sports Shop operation. And, two days later, Locascio received a letter from the "Lands End Supply Company (Division of Fisherman's Paradise Inc.)," bearing the signature "C. Santos," and, without doubt stimulated by the conversation between Locascio and Botsch. The letter stated, *inter alia*, that, as a New York State chartered corporation, Fisherman's Paradise Inc. was well within its rights in doing business in Sayville. Locascio was not placated by this communication. Accordingly, he complained to Post Office authorities and Postal Inspector Daniel E. Daly was assigned to the investigation.

On November 6, 1962, Daly, Postal Inspector Mailloux and Locascio went to the ferry terminal office in Sayville where they spoke to Stein. After identifying a picture of Botsch, Stein willingly disclosed the full circumstances under which the shanty had been rented to Botsch. Daly, with Stein's approval, looked through a window of the shack and observed empty cartons and boxes strewn about. Stein, by this time concerned that his property was being

utilized for illegal purposes, unlocked the shanty and asked the Inspectors if they wished to enter in order to examine what was stored there. Although, concededly, they did not possess a search warrant, the officers accepted Stein's invitation and, once inside, Inspector Mailloux compiled a list (later destroyed) of the shippers' names imprinted on several empty parcels.[6] While the record is not clear, it appears that the inspectors were inside the shanty briefly; other than listing the shippers' names, nothing was taken from the shack.

Sometime prior to November 8, an Assistant United States Attorney, acting in Daly's behalf, ascertained from the New York Department of State that no corporation named "Fisherman's Paradise Inc." was then chartered. In addition, Daly contacted Dun & Bradstreet and learned that there was some link—albeit unclear—between the so-called Fisherman's Paradise Inc. and the Olympic Arms store in Huntington. Moreover, and of significance in dealing with the questions presented on appeal, Daly was able to obtain from Dun & Bradstreet a list of manufacturers of sporting goods who had made inquiries concerning the credit of Fisherman's Paradise Inc.[7]

Commingling the names on this list with those obtained from the cartons in the Sayville shanty, Daly dispatched teletype inquiries to post offices in several major cities in the country. On November 7, he received from Wightman Electronics, Inc. (Wightman) the original of the order dated October 2, 1962, which had been dispatched over the signature of C. Sampos, and an affidavit of J. Ellis Orr of that company setting forth the circumstances under which the order had been filled.

Armed with this information, Daly proceeded to apply for two search war-

---

6. No hunting guns were found in the shack although there were a few packets of lures and a token amount of ammunition. The Inspectors observed nothing which they could identify as coming from Wightman Electronics, Inc.

7. This list of suppliers, like the one compiled from the cartons in the Sayville shanty, was destroyed prior to trial.

rants and a warrant for Botsch's arrest. The warrant of arrest was issued on the basis of Daly's complaint charging that Botsch had devised a scheme to defraud Wightman by obtaining merchandise through the mails on the letterhead of a fictitious company and by capitalizing, without authority, on the credit of another enterprise. Daly noted that his information was based on correspondence with Wightman.

At the same time, Daly obtained two search warrants relating, respectively, to Botsch's Olympic Arms store in Huntington and to the Sayville shanty. In applying for these warrants, Daly submitted affidavits which were identical in text except for their description of the premises to be searched. Each affidavit stated that Daly had reason to believe that, at the specified location, there was concealed "a quantity of guns and ammunition and other hunting and fishing equipment" fraudulently obtained through the mail "from Wightman Electronics, Inc. of Easton, Maryland." Daly noted that this statement was based upon an investigation which he conducted and which had produced the correspondence with Wightman. On each affidavit appeared the handwritten statement: "That deponent saw the aforesaid merchandise on Nov. 7th 1962."

In the afternoon of November 8, 1962, Botsch was arrested at his Olympic Arms store and a search was conducted there. Sporting merchandise which the officers believed were the fruit of the alleged scheme were removed from the shelves, piled on the floor and later transported by truck to post office headquarters. While this was transpiring, the Sayville shanty was also searched. Botsch, who was questioned in his Huntington store,

made inculpatory statements and agreed to accompany Daly and the other arresting officers to his home where certain invoices, Lands End letterhead stationery and a gun were surrendered. Botsch was then taken to the West Street House of Detention in Manhattan where he was further interrogated. Questioning was resumed the next morning at which time Botsch signed an inculpatory statement and was arraigned.

## II.

Prior to trial, Botsch moved to suppress his statements and all the evidence produced by the various searches. After holding a full hearing and writing a thorough and reasoned opinion, Judge Dooling granted and denied portions of the motion. The District Judge suppressed Botsch's statements as having been made during an excessively long pre-arraignment period in violation of the McNabb-Mallory Rule.[8] He also suppressed the evidence obtained on November 8 from Botsch's home as the fruit of the interrogation conducted during this period. Moreover, the Judge found that Inspector Daly had knowingly made materially false statements in applying for the warrants to search Botsch's Olympic Arms store and the Sayville shanty,[9] and, therefore, found the two search warrants invalid. And, because the government did not attempt to defend the November 8 search of the shack at Sayville, the judge did not give it further consideration.

In addition, Judge Dooling observed that Inspector Daly had been less than candid with respect to the first search of the shack in Sayville on November 6 which, as we have already noted, was made without a warrant. In fact, this search was not even disclosed until mid-

8. 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

9. As an illustration, although Daly knew that the only merchandise ordered from Wightman was a "Call of the Wild" recording machine and some records, he stated that both the store and the shanty contained "a quantity of guns and am-

munition and other hunting and fishing equipment" shipped from Wightman. Moreover, Daly's handwritten statement that he had observed the "aforesaid merchandise" on November 7, 1962 was false. Daly had seen no such material in Huntington on the specified date and was not even in Sayville on November 7.

way through the hearing on the motion to suppress. And, to further complicate the proceedings, the government conceded its inability to determine which suppliers' names and addresses had been procured from the November 6 search or obtained from Dun & Bradstreet.[10] The District Judge concluded, however, that the November 6 search of the Sayville shanty authorized by Stein was proper; and, the November 8 search of Botsch's Olympic Arms store was incidental to a lawful arrest and, thus, valid.

### III.

It is urged with vigor that since the November 6 shanty search was neither pursuant to a warrant nor incidental to a lawful arrest, it was *ipso facto* invalid and, *a fortiori*, the indictment should have been dismissed in light of the government's concession that it was unable to segregate the tainted from the untainted counts. In the circumstances presented here, however, we believe that Daly's and Mailloux's inspection of the shack was entirely reasonable and, thus, did not contravene the Constitution's prohibition against *unreasonable* searches and seizures. It is well established that while the Fourth Amendment speaks in terms of the right of people to be secure in their "homes," its protection is not restricted to dwellings and extends to places of business as well. Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931); Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Where premises are unoccupied, the degree of protection to which they are entitled may diminish, cf., Feguer v. United States,

302 F.2d 214 (8th Cir.), cert. denied, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962). In any event, the reasonableness of a search must be assessed in each case on the peculiar facts and circumstances presented. Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Rabinowitz, 339 U.S. 56, 70 S. Ct. 430, 94 L.Ed. 653 (1950); United States v. Dornblut, 261 F.2d 949 (2d Cir. 1958), cert. denied, 360 U.S. 912, 79 S.Ct. 1298, 3 L.Ed.2d 1262 (1959).

We are unpersuaded by our dissenting brother's reliance on Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), where the Court invalidated a search made with a landlord's consent. In *Chapman*, the landlord did not possess a key to the dwelling.[11] In the case before us, Stein not only possessed a key to the shack with Botsch's knowledge and approval, but Botsch expressly authorized him to use it for the purpose of accepting the deliveries which flowed from the fraudulent scheme. Thus, Stein and Botsch did not occupy a mere landlord-tenant relationship; Stein, having been made an unwitting accomplice by Botsch, had a vital interest in cooperating with the Inspectors so that he could remove any taint of suspicion cast upon him. Indeed, any individual under similar circumstances would have a right to promptly and voluntarily exculpate himself by establishing that his role in the alleged scheme was entirely innocent and passive.

This right to exculpate oneself also decisively distinguishes the November 6 search from those condemned in the so-called "hotel" cases relied upon by our dissenting colleague: Stoner v. State of

---

10. At the hearing, counsel for the government stated:

    I am prepared to concede that if the November 6th entry violated the Fourth Amendment, the indictment is tainted because we cannot distinguish—we don't know where we got the names from. We only know some names came from Dun & Bradstreet and some

names came from the shanty, and these names were intermingled in the indictment. * * *

11. The landlord authorized enforcement officers to climb through an unlocked window when he smelled "mountain dew" and suspected the operation of an illegal still.

California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L. Ed. 1819 (1949). While it is true that in each of these cases, the manager or clerk possessed a key to the hotel rooms, the circumstances did not warrant the conclusion that the key was to be utilized for anything other than to furnish the usual and normal conveniences to the guests such as permitting maids to enter in order to make beds, clean, etc. In none of these cases was the manager or clerk an innocent accomplice in illegal activities and in none of them was the key which he retained unknowingly utilized in furtherance of an illicit scheme.

If this were a simple case of a landlord authorizing a search of his tenant's property and no more, or, to use our dissenting brother's illustration, of a neighbor placing mail or a package inside and consenting to a search of an absent householder's dwelling merely because someone "suspects that a package or letter may have contained evidence of fraud," we would be presented with an entirely different question. But, here, as Judge Dooling found:

> Stein was not an inactive landlord, aloof from his tenant's activities and immune from any taint that inhered in them. * * * If the merchandise was being stolen through a confidence trick or obtained by a fraudulent scheme utilizing the mails, Stein was as guilty as his principal Botsch unless he was innocent in mind; his were, objectively, acts that were facilitating a fraud or theft or both. * *

Because Stein's activities—though innocent—were inextricably intertwined with Botsch's alleged scheme and cast suspicion upon him, we believe his authorization of the inspection when viewed in its full context rendered the search reasonable. Cf., Marshall v. United States, 352 F.2d 1013 (9th Cir. 1965), cert. denied, 382 U.S. 1010, 86 S.Ct. 618,

15 L.Ed.2d 526 (1966); United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962); Von Eichelberger v. United States, 252 F.2d 184 (9th Cir. 1958). It would be a harsh doctrine, indeed, that would prevent an innocent pawn from removing the taint of suspicion which had been cast upon him by a defendant's cunning scheme. Stein's innocence stood or fell on the very merchandise which, only after inquiry and inspection, could exculpate him.

It is urged, moreover, that we should invalidate the November 6 search because the government failed to establish that it would have been prejudiced by any delay which would have resulted from a formal search warrant application. We recognize the force of this argument; courts should not be niggardly in extending the protection of constitutional rights and there is much to be said for interposing a magistrate between enforcement officers and potential defendants. Nevertheless, in the circumstances presented here, we are not persuaded that the officers' failure to obtain a warrant rendered the search unreasonable. Once Stein, without being urged, coerced or imposed upon, invited the inspection, we believe for the reasons already stated, that Daly and Mailloux were wholly justified in examining the premises.

### IV.

 Nor are we persuaded that the November 8 search of Botsch's Olympic Arms store in Huntington was improper. That search was permissible as incidental to a lawful arrest. United States v. Rabinowitz, supra.

Botsch's arrest was proper on two distinct grounds. First, while it is true that Judge Dooling suppressed the search warrants Daly secured, the District Judge appropriately did not invalidate the warrant of arrest. Unlike the search warrants, the warrant of arrest was not based on information which Daly knew to be materially false.[12] But,

---

12. It is also significant that despite the general commingling of the names of man-

ufacturers obtained from the Sayville shanty and from Dun & Bradstreet, the

we need not labor this point because we believe that Daly, wholly apart from the warrant of arrest, had probable cause to apprehend Botsch. In addition to the information which Daly had already received from Locascio and Wightman, on November 8, Postal Inspectors Stroud and Caunter, who had the Sayville shanty under surveillance, saw Botsch personally remove merchandise from the shack. The Inspectors followed Botsch, first, to a Railway Express office in Bay Shore where he picked up another parcel, and, then, to his Olympic Arms store in Huntington. And, it is significant that Stroud and Caunter were with Daly when Botsch was apprehended. In light of all these circumstances, and particularly Botsch's association and connection with both the Olympic Arms store and the Sayville shanty, we have little doubt that probable cause existed for his arrest. See, e. g., United States v. Wai Lau, 329 F.2d 310 (2d Cir.), cert. denied, 379 U.S. 856, 85 S.Ct. 108, 13 L.Ed.2d 59 (1964); United States v. Moon, 351 F.2d 464 (2d Cir. 1965); United States ex rel. Mason v. Murphy, 351 F.2d 610 (2d Cir. 1965); United States v. Thompson, 356 F.2d 216 (2d Cir. 1965); United States v. Lewis, 362 F.2d 759 (2d Cir. 1966).

Botsch was apprehended in the Huntington store, which consisted of the actual store and a small back room. After brief questioning of a customer who was permitted to leave, the arresting officers closed the store and handcuffed Botsch. At Botsch's request, he was taken to the back room so that he could not be observed from the street and the handcuffs were removed. While there is conflicting testimony, Judge Dooling found "little reason to doubt" that Botsch aided the officers in segregating the fraudulently obtained merchandise. Indeed, while the search was in progress, Rich-ard Zimmer, an errand boy, was permitted to leave the store and purchase coffee and cigarettes for Botsch and the others.[13] Under these circumstances, Judge Dooling cannot be faulted for concluding that the search of the Olympic Arms store was reasonable as incidental to a lawful arrest.

We find no merit, also, in Botsch's suggestion that the November 8 search was improper because not confined to products obtained from Wightman, the company mentioned in the warrant of arrest. Since, as we have noted, the search can be upheld independently of the warrant, this argument is not persuasive. And, it would be ironic indeed, if a permissible search which uncovered the fruit of the illegal activity was to be rendered invalid because it was not enumerated in an already voided search warrant. Cf. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

### V.

Finally, it is urged that Judge Dooling erred in instructing the jury that it could convict on the basis of circumstantial evidence if convinced of guilt beyond a reasonable doubt. It is asserted that Judge Dooling should have charged that when the evidence is wholly circumstantial, the proof must exclude every reasonable hypothesis of the accused's innocence.

In support of his position, Botsch argues that since no witness actually saw him sign the name "Sampos" or "Santos" on the fraudulent orders or actually observed him place the letters in the mail, his conviction was grounded on purely circumstantial evidence. Botsch also asks us to note that one Charles Sampas was employed as a clerk in the Olympic Arms store and had access to Lands End Supply Company stationery. He sug-

---

record reveals that information concerning Botsch's dealings with Wightman was procured exclusively from Dun & Bradstreet and, therefore, the warrant for Botch's arrest was not the product of the November 6 search at Sayville.

13. It is true that Botsch was interrogated while the search was in progress, but Judge Dooling suppressed the fruit of that questioning and, consequently, there is no basis for complaint at this time.

gests, therefore, that the jury could have inferred that Sampas was the perpetrator of the alleged scheme.

While the name "Sampas" resembles "Sampos" or "Santos" appearing on the fraudulent orders, Sampas testified and vigorously denied dispatching or signing the orders or signing the letter to Locascio.[14] Moreover, Sampas swore that when he inquired of Botsch as to his reason for maintaining the Sayville shanty under the name "Fisherman's Paradise," Botsch replied that he was "capitalizing on free advertising" and the advantages that might flow from the confusion that the similar names engendered.

In light of this and other testimony,[15] we believe there was ample evidence to take the case to the jury and that Judge Dooling's charge was proper and in accord with the principle established in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1948) and United States v. Woodner, 317 F.2d 649, 651 (2d Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963). As we noted in *Woodner*:

> [T]he settled rule in this Circuit is that circumstantial evidence is not "probatively inferior to direct evidence" * * * Thus, it may be weighed by the jury in the same way as direct evidence and need not exclude all other reasonable hypotheses than that of guilt to be given whatever probative force it deserves.

We have considered Botsch's other contentions and find them without merit.

Affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent.

Although the search of the Olympic Arms store on November 8 may be open to question, I would not reach this point, but would reverse on the sole ground that the search on November 6 of the Sayville shed was unreasonable.

The Supreme Court has cautioned that "rights protected by the Fourth Amendment are not to be eroded by strained doctrines of the law of agency * * *" Stoner v. State of California, 376 U.S. 483, 488, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964). See also Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 233 (1960). And it is true that whether a search is reasonable depends largely on particular facts. But there is no reason to ignore the fact that Stein's authority was limited, and that when he facilitated the entry of the Inspectors he was not at the same time also performing any function entrusted to him by Botsch, and for which he was given the key. I would put aside for another occasion, when the question is squarely presented, resolution of the issues tendered in Marshall v. United States, 352 F.2d 1013 (9th Cir. 1965), cert. denied 382 U.S. 1010, 86 S.Ct. 618, 15 L.Ed.2d 526 (1966); United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962); and Von Eichelberger v. United States, 252 F.2d 184 (9th Cir. 1958). As the majority appears to agree, these cases are distinguishable on the ground that at the time consent was given, the owner or bailee was in lawful possession within the terms of the bailment or lease, or otherwise entitled generally to enter the *premises*.

It has been held that even the consent of one lawfully in possession or occupancy cannot make reasonable a search into another's personal effects. Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955); United States v. Blok, 88 U.S. App.D.C. 326, 188 F.2d 1019 (1951); Reeves v. Warden, 346 F.2d 915 (4th Cir. 1965). Contrast Rees v. Peyton, 341 F.2d 859 (4th Cir. 1965); Roberts v. United States, 332 F.2d 892 (8th Cir.

---

14. The testimony of the handwriting experts at trial was inconclusive as to who signed the fraudulent orders. The experts noted that it is not difficult to conceal one's handwriting style.

15. On appeal, we may view the evidence in the light most favorable to the government. United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963).

1964), cert. denied 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965); United States ex rel. McKenna v. Myers, 232 F. Supp. 65 (E.D.Pa. 1964), aff'd 342 F.2d 998 (3rd Cir.), cert. denied 382 U.S. 857 (1965); and Burge v. United States, 342 F.2d 408 (9th Cir.), cert. denied 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965), where the searches were in community rooms. These cases recognize that even if one's right to entry is unlimited, consent may be ineffective to make reasonable a search.

Similarly, when the right to entry is limited, the consent is the less effective. It has long been held that where one's right to possession or occupancy is as great as another's, consent can be effective. Reszutek v. United States, 147 F. 2d 142 (2d Cir. 1945); Stein v. United States, 166 F.2d 851 (9th Cir.), cert. denied 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768 (1948); see the cases collected in *Eldridge,* supra, 302 F.2d at 465, notes 3–6. In such a case consent is not usually made on behalf of the absent person. The consenting person has an independent right to permit the search. In other situations, where the consenting person has a lesser right to occupancy or possession, which might not alone permit a search on consent, it has sometimes been held that the absent person has made the consenting party his agent to consent, see Teasley v. United States, 292 F.2d 460 (9th Cir. 1961), or that he accepts the risk of effective consent, *Marshall,* supra, but such an agency must be clearly shown. Klee v. United States, 53 F.2d 58, 61 (9th Cir. 1931).

Since consent was here given while Stein was not engaged in receiving or paying for shipments, we are not called upon to decide either whether or not Botsch authorized Stein to consent to searches while engaged in such activity, or whether or not Stein's right to enter then would be sufficient to make effective his own consent, for entry, or for search, or for both. When he consented to the entry, and opened the door, he was in no different a position from the hotel clerk in *Stoner,* the hotel manager in Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949) and United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), or the landlord in Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). I cannot agree that the suspicion which naturally would be cast on Stein compels a different result than these cases. It neither increased his right to occupancy nor created an agency so that Stein could give Botsch's consent. Nor can it be said that Botsch "accepted the risk," as in *Marshall,* that Stein would let the Inspectors search. That, like the implied agency, is a species of the "unrealistic doctrines of 'apparent authority'" condemned in *Stoner.* The fact that Stein, like the hotel clerk, at some time could properly enter is no reason to infer either authority to enter on an occasion such as this, or to give Botsch's consent. And it defies reason to conclude that Botsch intended that Stein, out of his unwitting role in the fraud, could effectively consent to a search. If this search was good, any neighbor with whom a key is left so that newspapers, mail or packages may be put inside the door in a householder's absence may authorize a general search of the house if anyone suspects that a package or letter may have contained evidence of fraud. I would not so erode the right to be free from unreasonable searches in order to sustain the conviction of this rascal. I would reverse.