UNITED STATES of America,

v.

David Rudolph POINDEXTER, Defendant.

No. 70 Cr. 897.

United States District Court, S. D. New York.

March 9, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., by John H. Doyle, III, Asst. U. S. Atty., New York City, for plaintiff.

Arkin & Horan, by Stanley S. Arkin, New York City, for defendant.

CANNELLA, District Judge.

The defendant is charged in an indictment filed in this District Court on October 30, 1970 with harboring and concealing the fugitive Angela Yvonne Davis from "on or about the 15th day of August, up to and including the 13th day of October 1970" in violation of 18 U.S.C. § 1071.

On November 24, 1970, the defendant moved pursuant to Rule 6(b) (2) of the Federal Rules of Criminal Procedure (F.R.Cr.P.) and the Jury Selection and Service Act of 1968,[1] 28 U.S.C. § 1867(a), to dismiss the indictment or, in the alternative, for a hearing to determine if the grand jury which returned the indictment was selected in compliance with the Act. The defendant also filed motions on November 24th for a bill of particulars pursuant to Rule 7(f), F.R.Cr.P.; for discovery and inspection pursuant to Rule 16, F.R.Cr.P.; for suppression of evidence pursuant to Rule 41(e), F.R.Cr.P.; and for an order permitting inspection and copying of the minutes of the proceedings before the grand jury pursuant to Rule 6(e), F.R. Cr.P.

I.

The court granted that part of the defendant's motion which sought a hearing to determine if the grand jury had been selected in compliance with the Act.[2] The hearing was scheduled for

---

1. Referred to hereinafter as "Act."

2. Section 1867 of Title 28, U.S.C. reads, in pertinent part:

(a) In criminal cases * * * the defendant may move to dismiss the indictment * * * on the ground of

December 17, 1970 at which time the defendant indicated his inability to adduce any evidence tending to substantiate his allegation that there has been "a substantial failure" to comply with the provisions of the Act.[3] The court thus reiterates now what was said to the defendant at the hearing, namely, that his motion to dismiss the indictment on the ground stated is denied without prejudice. See Hearing Minutes, pp. 6, 8.

## II.

The defendant makes 14 specific requests in his motion for a bill of particulars. The government has consented to comply with those numbered 1 (if known), 2, 3 and 8, and they are hereby granted. The court finds that requests 4 through 7 seek, in essence, pre-trial disclosure of the government's case, and they are therefore hereby denied. See, e. g., United States v. McCarthy, 292 F. Supp. 937, 940 (S.D.N.Y.1968). Requests 9 through 14 are also hereby denied.

## III.

The defendant's motion for discovery and inspection contains eight specific requests. The government has consented to those numbered 1, 3, 5 and 6, and they are hereby granted. Requests 2, 4 and 7 are hereby denied. The court finds that request 8 is essentially governed by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the government has indicated that it is aware of its responsibilities set forth in this decision.

## IV.

The defendant's motion made pursuant to Rule 41(e), F.R.Cr.P. seeks an order suppressing evidence obtained as a result of illegal eavesdropping or searches and seizures. A hearing commenced on December 17, 1970 at which time it was determined that the motion was directed at five different searches conducted by federal agents.[4] The first search in question was conducted by agents of the Federal Bureau of Investi-

substantial failure to comply with the provisions of this title in selecting the grand or petit jury. * * *

(d) Upon motion filed under subsection (a) * * * containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the grand jury, the court shall stay the proceedings pending the selection of a grand jury in conformity with this title or dismiss the indictment, whichever is appropriate. * * *

3. The defendant's motion to dismiss the indictment also includes an application for an order of this court, made pursuant to 28 U.S.C. § 1867(f) [and art. X of the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York], directing disclo-

sure of the contents of records or papers used by the jury clerk in connection with the jury selection process.

The court's intent in scheduling the hearing for December 17th was to afford the defendant an opportunity to adduce any evidence contemplated in 28 U.S.C. § 1867(d) tending to supplement the less than persuasive affidavit in support of this application. The defendant presented no such evidence, nor did he indicate that he had made any efforts at discovery prior to the hearing independent of the application.

4. Prior to the hearing, the Assistant United States Attorney had stated that his Office was "unaware of any evidence obtained during the course of the investigation of this case resulting from any illegal electronic surveillance by Federal, State or Local agencies." Affidavit of John H. Doyle, III, pp. 9–10. See also Hearing Minutes, pp. 75–76. The hearing itself did not produce any evidence tending to refute this representation, and that part of the defendant's motion directed at illegal eavesdropping is therefore hereby denied without prejudice to be renewed at such time as it is shown that illegal eavesdropping was used in the investigation.

gation (FBI) on September 30, 1970 in apartment 20A on the twentieth floor of the high-rise apartment building located at 6701 South Crandon Avenue in Chicago, Illinois. The second search took place on October 9, 1970 in apartment B 115 of the Golf Lake Apartments, 2601 NW 115th Street, Miami, Florida. The defendant and Miss Davis were arrested together at approximately 6 p. m. on October 13, 1970 at the Howard Johnson Motor Lodge on 52nd Street and Eighth Avenue in Manhattan, and a search was made both of the person of the defendant and of room 702 in which he and Miss Davis allegedly had been staying. On October 14, 1970, the FBI searched a Toyota automobile bearing Florida license plate number 10D–11785 which had been parked in the garage of the Howard Johnson Motor Lodge. Of these five searches, only the last one—of the car—was conducted pursuant to a warrant.

At the start of the hearing, the government did not oppose that part of the defendant's motion directed at suppressing all evidence obtained from the searches in the Miami apartment and the New York motel room,[5] and the motion is therefore hereby granted with regard to those two searches.

\* \* \*

On the other hand, the government called a number of witnesses in opposing the motion with regard to suppression of the evidence obtained in the search of the Chicago apartment.[6]

One Robert Loman testified that he lives in apartment 19A at 6701 South Crandon Avenue in Chicago and that during September, 1969 he became acquainted with the defendant. In November, 1969, the defendant asked Mr. Loman to attempt to rent an apartment in his high-rise building for the defendant. On or about November 17, 1969, Mr. Loman signed a lease[7] for the apartment—20A—directly above his own, commencing on January 1, 1970 and expiring on September 30, 1971. Mr. Loman testified that at the time he negotiated this lease, he informed the realty agent that he was renting the apartment for a "friend", although he did not mention the defendant by name. See Hearing Minutes, p. 251. See also id., p. 302. Mr. Loman initially paid the realty company amounts essentially equal to five months' rent in advance plus the required security deposit. Compare Exhibits 9 and 10 with Exhibits 11 and 12. The court finds that Mr. Loman was fully reimbursed for this payment[8] by the defendant, who took possession of apartment 20A on February 1, 1970.

Sometime in September, the FBI office in Los Angeles notified its counterpart in Chicago that a telephone call had been made during August from the California residence of Kendra and Franklin Alexander[9] to a certain telephone num-

5. See Hearing Minutes, p. 9. Cf. Affidavit of John H. Doyle, III, pp. 10–11.

6. The fruits of this search which the government would seek to offer in evidence at the trial of this case are the testimony of a FBI fingerprint expert with regard to fingerprint(s) lifted from a bottle found in apartment 20 A and the testimony of FBI agent Joseph Carroll that he saw an issue of *Life* magazine in the apartment with a picture of Miss Davis on the cover, captioned: "Making of a Fugitive. Angela Davis wanted by the FBI." See Hearing Minutes, pp. 54–58. See also id., p. 225.

7. Exhibit 9. Mr. Loman also signed a rider to this lease, Exhibit 10, renting a parking stall which was subsequently used for an automobile purchased by Mr. Loman on behalf of the defendant.

8. The court further finds that none of the rental payments made by Mr. Loman during the period pertinent to this motion to suppress ever represented his own money, nor were they made on his own behalf. See Hearing Minutes, p. 256.

9. In answer to a question of how the FBI was attracted to the Alexander residence, agent Edward Kinzer of the Chicago office testified that a "car belonging to Angela Davis had been found in an apparent abandoned condition near this residence and that the Alexanders were known friends, close friends, of Angela Davis." Hearing Minutes, p. 391.

ber in Chicago. It was determined that this number was subscribed to by one "David Day",[10] apartment 20A, 6701 South Crandon Avenue. Further investigation led agents to Mr. Loman and a friend of the defendant, Mrs. Ruby Jones, among others:[11] Mrs. Jones was questioned about the defendant and apartment 20A on September 28 and 29, 1970; Mr. Loman was interrogated on September 29th. Still "looking for anything that might be of lead value"[12] in locating the defendant (and Miss Davis) at about 8 a. m. the next day, September 30th, the FBI directed the agents conducting the investigation in Chicago to search apartment 20A.[13] Two agents then appeared at Mrs. Jones's place of employment and asked her to consent to a search. Mrs. Jones told the agents she could not let them into the apartment since she did not have the necessary key(s), but she did accompany them to 6701 South Crandon. The two agents and Mrs. Jones proceeded first to apartment 19A where Mr. Loman signed a consent to search form[14] and then to apartment 20A where the locks on the door had been picked before their arrival by an employee of the FBI. A number of other agents were already at and/or in the apartment.

"[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967); Mancusi v. De Forte, 392 U.S. 364, 370, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Wyman v. James, 400 U.S. 309, 317, 91 S.Ct. 381, 385, 27 L.Ed.2d 408, 413 (1971). Since the search of apartment 20A was not conducted pursuant to a valid warrant, its legality hinges on whether there was "proper consent".

The government argues that "the consent of Robert Loman was proper authority for the search" in that the defendant's occupancy of apartment 20A "was wholly derivative from Loman who was lessee and solely responsible for the rent. There was no sub-lease in writing and [the defendant's] right of possession was at the will of Loman."[15] In support of this argument, the government relies, inter alia, on the fact that Mr. Loman refused to allow the defend-

---

10. A pseudonym used by the defendant.

11. While the testimony at the hearing was somewhat confusing and contradictory, it appears that at the time the defendant took possession of apartment 20 A the entrance door was equipped with two locks, both of which required the same key: The defendant apparently was given two such keys, and Mr. Loman acquired a third. Mrs. Jones subsequently came into possession of one of the defendant's two keys.

In August, 1970, the defendant agreed to allow a friend of Mrs. Jones stay in the apartment temporarily, and this friend apparently began living in apartment 20 A on or about the end of August. At or about the same time, the top lock on the entrance door was changed so that two separate keys were needed to open the door. There were two such keys in existence for this new lock.

12. Hearing Minutes, p. 51.

13. No one was present in the apartment at the time.

14. Exhibit 3. Mr. Loman had told the agents over the telephone prior to their arrival at his apartment that he did not have a key to the top lock. See Hearing Minutes, p. 296.

Mrs. Jones also signed a consent to search form, Exhibit 2. She testified that she signed this document only after she had entered apartment 20 A on September 30th, while both agents accompanying her testified that she signed it in their car before entering the building and going to Mr. Loman's apartment. Compare pages 197–201 of the Hearing Minutes with pages 101, 191.

In addition, Mrs. Jones affixed her name to a receipt, Exhibit 7, drafted by one of the agents, listing various firearms seized in apartment 20 A. There is no dispute that Mrs. Jones signed this in the apartment.

15. Government's Memorandum of Law, p. 16. The government makes a similar argument with regard to Mrs. Jones, albeit with considerably less emphasis. See id., p. 20.

ant to take possession of apartment 20A on January 1, 1970 as originally intended;[16] that Mr. Loman retained a key to the apartment after February 1, 1970; that Mr. Loman refused to allow the defendant to use the car, which had been acquired in Mr. Loman's name on behalf of the defendant, for transporting Miss Davis;[17] and that it was the friend of Mrs. Jones staying in the apartment during September, 1970 who actually paid the rent for that month.[18] The government contends that these facts make United States v. Botsch, 364 F.2d 542 (2d Cir. 1966), cert. denied, 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810, rehearing denied, 386 U.S. 987, 87 S.Ct. 1290, 18 L.Ed.2d 242 (1967), the precedent controlling the search in question here.

Starting with the premise that "the reasonableness of a search must be assessed in each case on the peculiar facts and circumstances presented," the Court of Appeals concluded in *Botsch* that since the activities of the landlord —"though innocent—were inextricably intertwined with [the defendant's] alleged scheme and cast suspicion upon him * * * his authorization of the inspection when viewed in its full context rendered the search reasonable."[19] 364 F.2d at 547, 548. That context revealed the landlord's unlocking from time to time of a shanty rented to the defendant in order to effect the reception and storage of parcels sent pursuant to a scheme devised by the defendant in violation of 18 U.S.C. §§ 1341– 1342. In other words, the landlord "not only possessed a key to the shack with [the defendant's] knowledge and approval, but [the defendant] expressly authorized him to use it for the purpose of accepting the deliveries which flowed from the fraudulent scheme. Thus, [the landlord and the defendant] did not occupy a mere landlord-tenant relationship; [the landlord], having been made an unwitting accomplice * * * had a vital interest in cooperating with the Inspectors so that he could remove any taint of suspicion cast upon him." 364 F.2d at 547.

In the case at bar, there is nothing in the record tending to show that the renting of apartment 20A in November, 1969 amounted to anything more than one friend's doing another a favor or that this act represented an element necessary for the implementation of a criminal scheme. While making no attempt to classify legally the relationship between Mr. Loman and the defendant, the court finds that it clearly did not approach that of a landlord and tenant,[20] nor was it "inextricably intertwined" so as to make Mr. Loman's motivation in

---

16. See generally Hearing Minutes, pp. 257– 58, 260–63.

17. See generally id., pp. 281–91.

18. See id., p. 256. The government argues that the "circumstances that were existing as of September 30, 1970 had changed." Id., p. 92. While it is true that the defendant was only present in the apartment over Labor Day weekend during the month of September and that the rent for the month was paid by his guest, these facts without more do not change what is implicit in the government's argument, to wit, that apartment 20 A had earlier become the defendant's "house." At the time of the search, the apartment contained essentially only his papers and effects. See generally id., pp. 117–23, 175–76. The fact that Mr. Loman made other arrangements for the apartment subsequent to the search (and the defendant's arrest) is irrelevant.

19. The landlord not only consented to the search, he actually encouraged it.

20. "The premise that property interests control the right of the Government to search and seize has been discredited." Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 304, 87 S.Ct. 1642, 1648, 18 L.Ed.2d 782 (1967). In discussing the scope of the Fourth Amendment right and the standing of a victim of a search to assert this right, the Supreme Court has stated that the Amendment "protects people, not places," Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967); that "it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law," Jones v. United States, 362 U.S. 257, 266, 80

consenting to the search a factor of significance such as was true in *Botsch*. The precise issue then is whether this relationship was such as to make Mr. Loman's consent to the search binding on the defendant. The court is not persuaded that the defendant is bound by this consent. If the test be that the consent of a holder of a right in property is binding as against a fellow property right holder where the consenting party is in possession when the consent is given *and* has a right equal to or greater than that of the fellow holder,[21] then Mr. Loman's consent does not bind the defendant: The court finds that Mr. Loman was not in actual possession of apartment 20A on September 30, 1970,[22] nor was he in constructive possession in view of the fact that he did not have a key to the top lock on the door. And assuming *arguendo* that Mr. Loman's role as nominal lessee (and intermediary for the payment of the rent) gave him a property right equal to or greater than that of the defendant, he

nevertheless stood in no better position than the landlord who smelled "mountain dew" in Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). A thought set forth in Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), and restated in modified form in *Chapman* is apposite here:

> [T]o uphold such an entry, search and seizure "without a warrant would reduce the [Fourth] Amendment to a nullity and leave [tenants'] homes secure only in the discretion of [landlords]." [23]

The majority opinion in *Botsch* distinguished Judge Smith's reliance on *Chapman* in his dissenting opinion on the ground that the landlord did not possess a key to the dwelling. See 364 F.2d at 547. No such distinction exists in this case.

■ Since the court finds that Mr. Loman's consent was not binding on the defendant, it is *a fortiori* that the con-

---

S.Ct. 725, 733, 4 L.Ed.2d 697 (1960); and that the "Amendment does not shield only those who have title to the searched premises," Mancusi v. De Forte, 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed. 2d 1154 (1968).

21. See, e. g., Anderson v. United States, 399 F.2d 753, 756 (10th Cir. 1968).

22. Mr. Loman testified that he never lived in the apartment. See Hearing Minutes, p. 301. It is therefore understandable that before conducting the search the FBI had sought to locate, albeit without success, the friend of Mrs. Jones who had been staying in the apartment from time to time during September.

The court notes that it was the defendant, and not Mr. Loman, who gave her permission to stay in the apartment in the first place.

23. 365 U.S. at 616–617, 81 S.Ct. at 780. See also Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk consented to search of guest's room), and the cases cited therein.

The government refers the court in its thorough brief to a number of recent cases involving searches consented to by persons whose relationship to the victim of the search, the government argues, was no more and in some instances even less binding than that of Mr. Loman to the

defendant. But this court does not find that Mr. Loman was a co-occupant of the searched premises as the courts found with regard to the consenting party in Wright v. United States, 389 F.2d 996 (8th Cir. 1968); Burge v. United States, 342 F. 2d 408 (9th Cir.), cert. denied, 382 U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965); Teasley v. United States, 292 F.2d 460 (9th Cir. 1961)—nor was he a homeowner consenting to the search of a room in his house as in United States v. Reed, 392 F.2d 865 (7th Cir.), cert. denied, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968); Weaver v. Lane, 382 F.2d 251 (7th Cir. 1967), cert. denied, 392 U.S. 930, 88 S.Ct. 2289, 20 L.Ed.2d 1390 (1968)—or the parent or spouse of the defendant as in United States ex rel. Combs v. LaVallee, 417 F.2d 523 (2d Cir. 1969), cert. denied, 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970); United States v. Mackiewicz, 401 F.2d 219 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968); Maxwell v. Stephens, 348 F.2d 325 (8th Cir.), cert. denied, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965); Roberts v. United States, 332 F.2d 892 (8th Cir. 1964), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274 (1965); United States v. Twiford, 315 F.Supp. 801 (W.D. Mo.1970).

sent of his other friend, Mrs. Jones, was not binding either.[24]

With regard to the timing of the search, the court understands the government's position to be that the search of apartment 20A was conducted only pursuant to the two signed consent forms.[25] While the evidence adduced at the hearing generally supports this position, it is by no means clear to the court that the FBI would not have searched the apartment had the agents not acquired the signatures of Mr. Loman and Mrs. Jones or that at the very moment obtained, they were not ex post facto. There is no question but that the door to the apartment had been opened prior to the arrival on the scene of the two agents with the consent form(s) and Mrs. Jones. There is a question, however, whether either of these forms had actually been signed (though unknown to the agents already at the apartment) before the locks were picked, even accepting the agents' testimony that Mrs. Jones signed her form in the parking lot.[26] The Fourth Amendment reads, in pertinent part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.

It appears that this right of the defendant was violated as a result of the investigative zeal of some of the agents irrespective of the constitutional propriety of the consent of his friends. But be that as it may, this court finds there was no "proper consent" in this case and that the search of apartment 20A, 6701 South Crandon Avenue, Chicago, Illinois on September 30, 1970 was therefore "unreasonable." See Camara v. Municipal Court of City and County of San Francisco; Mancusi v. De Forte; Wyman v. James, supra.

■ In view of the foregoing, the defendant's motion to suppress all evidence obtained in this search is hereby granted, and the government is directed to return to the defendant forthwith all of his property that was seized [27] which is not otherwise subject to lawful detention within the meaning of Rule 41(e), F.R. Cr.P.[28]

\* \* \*

■ That part of the defendant's motion directed at suppressing evidence obtained as a result of the search of his person is hereby denied.

> The constitutional validity of the search * * * depend[s] upon the constitutional validity of the [defendant's] arrest. Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.[29]

The court finds that the evidence adduced at the hearing conclusively shows that the agents of the FBI who arrested the defendant in New York had probable

---

24. Mrs. Jones's only interest in apartment 20 A was her friendship with the defendant. She lived during all times pertinent to this case with her husband and family at 8405 South May Street, Chicago.

25. See, e. g., Government's Memorandum of Law, pp. 10–11; Hearing Minutes, p. 296.

26. Compare, for example, the testimony on pages 236–37 of the Hearing Minutes with that on pages 367–68.

27. The agents seized a number of telephone bills found in the apartment which later proved to be of no investigative or evidentiary value, and they were thrown away. This court finds such discarding of seized property, no matter how inconsequential it might appear to investigators, to be uncalled for, and such conduct should not be repeated.

28. This directive applies also to all property seized in the Miami apartment and the New York motel room.

29. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

cause to make it [30] and that the search of the defendant's person incident to his arrest was therefore valid.

\* \* \*

■ That part of the defendant's motion directed at suppressing evidence obtained as a result of the search of his automobile is also hereby denied. This search was conducted pursuant to a warrant, the probable cause for the issuance of which the defendant concedes—except for the possibility of "taint."[31]

## V.

■ Despite the defendant's very excellent memorandum of law in support of his motion for the production and inspection of the grand jury minutes, the court is not persuaded that there is any need to inspect these minutes now, and the motion is therefore hereby denied at this time without prejudice to be renewed at the time of trial.[32]

\* \* \*

The government is directed to comply promptly with this opinion, which shall serve as an order of this court, in providing the defendant with the bill of particulars and other relief granted.

So ordered.

---

30. See generally Hearing Minutes, pp. 398–473.

31. See, *id.*, p. 474. While having reserved decision on the entire issue of "taint" in this case for a later date, the court is not persuaded after reading the affidavit in support of the application for the warrant that it contained any tainted information.

32. Cf. Hearing Minutes, pp. 217–18.