## CHAPMAN v. UNITED STATES.

No. 175.   Argued February 23, 1961.—Decided April 3, 1961.

*J. Sewell Elliott* argued the cause and filed a brief for petitioner.

*Robert S. Erdahl* argued the cause for the United States.   On the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *Kirby W. Patterson.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Acting without a warrant but with the consent of the petitioner's landlord, Georgia law enforcement officers entered—through an unlocked window—and searched petitioner's rented house, in his absence, and there found and seized an unregistered "distillery" and 1,300 gallons of "mash."   Soon afterward petitioner was indicted in

the District Court for the Middle District of Georgia for violations of the federal liquor laws.[1] He promptly moved the court for an order suppressing the use of the seized items as evidence at his impending criminal trial on the ground that they were obtained by an unlawful search and seizure. After hearing evidence, the court held that the search and seizure were lawful under federal standards and denied the motion.

At the subsequent trial, the evidence sought to be suppressed was offered and received, over petitioner's renewed objections. Upon that evidence, the jury found petitioner guilty, and the court sentenced him to imprisonment for a year and a day. On appeal, the Court of Appeals for the Fifth Circuit affirmed. 272 F. 2d 70. To examine petitioner's claim that the courts below violated the standards governing admissibility of timely challenged evidence in federal courts, we granted certiorari. 363 U. S. 836.

The relevant evidence is not controverted. It shows the following: One Bridgaman, and another, owned a dwelling house in a wooded area near the Macon, Georgia, airport, which they commonly rented through a rental agency. Understanding that the house had been rented to a new tenant, Bridgaman, on Sunday, February 16, 1958, went to the house for the purpose of inviting the tenants to attend church. Upon arrival he noted a strong "odor of mash" about the house. There was no response to his knock, and, although he tried to do so, he was unable to see into the house. He then returned to his home and, by telephone, advised the local police department of his observations. Soon afterward two local police officers, Harbin and Chance, arrived at Bridgaman's home, and the three then went to the rented

---

[1] 26 U. S. C. §§ 5601, 5606.

house. They noticed a strong odor of "whiskey mash" coming from the house. After their knock at the door failed to produce a response, they walked around the house and tried to look into it but were unable to do so because the shades were down. They found that all of the windows were locked, save one in the bathroom. The officers testified that Bridgaman told them "to go in the window and see what['s] what in there." Bridgaman's version of what he said was: "If it's what I think it is, what it smells like, yes, you can have my permission to go in." Thereupon they opened the bathroom window and, with the assistance of Bridgaman and Chance, Harbin entered the house through that opening. Upon entering the house he saw a complete and sizable distillery and 1,300 gallons of mash located in the living room. Apart from some accessories, containers and firewood, there was nothing else in the house. Harbin then called to Chance that he had found a large still and asked him "to go get some help." Chance immediately left—dropping Bridgaman at his home—to call the federal officers. While the federal officers were en route to the house, petitioner drove up, unlocked the front door, entered the house and was immediately arrested by Harbin. The federal officers soon arrived and took custody of petitioner. They also saved samples of the mash, took various pictures of the scene and then destroyed the still and its contents. Neither the state nor the federal officers had any warrant of any kind.

Although the decisions below were rendered prior to this Court's decision in *Elkins* v. *United States*, 364 U. S. 206, the doctrine of that case is not here involved, as the lower courts explicitly rested their determinations on the ground that the search and seizure, though made by state officers, were valid under federal standards. Hence, the only question here is whether those determinations were correct. We believe that they were not.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses,.papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Until *Agnello* v. *United States,* 269 U. S. 20, this Court had never directly decided, but had always assumed, "that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein" (*id.,* at 32), but that case explicitly decided that "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are . . . unlawful notwithstanding facts unquestionably showing probable cause." *Id.,* at 33.

At least two decisions of this Court are closely relevant. *Taylor* v. *United States,* 286 U. S. 1, and *Johnson* v. *United States,* 333 U. S. 10. In the *Taylor* case, Federal agents had received "complaints" respecting activities at a certain garage in Baltimore and decided to "investigate." As they "approached the garage they got the odor of whiskey coming from within." Looking through a small opening, they saw a number of cardboard cases. Although they had no warrant of any kind, they "broke the fastening upon a door, entered and found one hundred twenty-two cases of whiskey. No one was within the place and there was no reason to think otherwise. While the search progressed, Taylor came from his house and was put under arrest. The search and seizure were undertaken with the hope of securing evidence upon which to indict and convict him." *Id.,* at 5.

In condemning that search and seizure, this Court said that the officers "had abundant opportunity [to obtain a warrant] and to proceed in an orderly way even after the odor had emphasized their suspicions; there was no probability of material change in the situation during the time necessary to secure such warrant.   Moreover, a short period of watching would have prevented any such possibility. . . .   Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guarantees against unreasonable search."   The Court concluded that "in any view, the action of the agents was inexcusable and the seizure unreasonable.   The evidence was obtained unlawfully and should have been suppressed."   *Id.*, at 6.

In the *Johnson* case, state narcotic agents, while in the hallway of a hotel, recognized a strong odor of burning opium coming from a particular room.   Without knowing who was occupying the room, they knocked and, after some delay, the door was opened.   The agents then entered the room and told the occupant "to consider [herself] under arrest because we are going to search the room."   The search produced incriminating opium and smoking apparatus which was warm from recent use. The District Court refused to suppress that evidence and admitted it over defendant's objection at the trial and she was convicted.   In reversing, this Court said:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.   Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

"There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. But this is not such a case." 333 U. S., at 13–15.

Here, as in that case, "No reason is offered for not obtaining a search warrant except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. These are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear." 333 U. S., at 15.

We think it must be concluded here, as it was in *Johnson*, that "If the officers in this case were excused from the constitutional duty of presenting their evidence to a mag-

istrate, it is difficult to think of a case in which it should be required." 333 U. S., at 15. See also *Lustig* v. *United States,* 338 U. S. 74; *United States* v. *Rabinowitz,* 339 U. S. 56; *United States* v. *Jeffers,* 342 U. S. 48; *Jones* v. *United States,* 357 U. S. 493.

Actually, the Government does not contend in this Court that this search and seizure, as such, met the standards of the Fourth Amendment. Instead, it says: "Our position is that when the landlord, paying a social call, found good reason to believe that the leased premises were being wasted and used for criminal purposes, he had authority to enter as a matter of right and to bring officers with him for this purpose." It says that, under the common law, a landlord has an absolute right to enter the demised premises "to view waste," and that he should be able to exercise that right through law enforcement officers to whom he has delegated his authority. But it cites no Georgia or other case holding that a landlord, in the absence of an express covenant so permitting, has a right forcibly to enter the demised premises without the consent of the tenant "to view waste." And, so far as our research discloses, no Georgia case so holds.

The only relevant authority cited by the Government is a statement from Tiffany, Landlord and Tenant (1910 ed.), § 3. b. (2), p. 9, that "It has also been said that [the landlord] may enter to 'view waste,' that is, to determine whether waste has been committed, *provided at least that this does not involve the breaking of windows or doors . . . .*" [2] (Emphasis added.) There are several answers to this contention. First, here the landlord and the officers forced open a window to gain entry to the premises. Second, "their purpose in entering was [not to view waste but] to search for distilling equipment . . . ." *Jones* v. *United States, supra,* at 500. Third, to uphold

---

[2] Only ancient English cases are cited in support of the text.

such an entry, search and seizure "without a warrant would reduce the [Fourth] Amendment to a nullity and leave [tenants'] homes secure only in the discretion of [landlords]." *Johnson* v. *United States, supra,* at 14. Moreover, "it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . . [W]e ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime." *Jones* v. *United States,* 362 U. S. 257, 266–267.

After pointing to the fact that a Georgia statute (Title 58 Ga. Code § 106) provides that the unlawful manufacture of distilled liquor on rented premises shall work a forfeiture of the rights of the tenant, at the option of the landlord, and that another (Title 58 Ga. Code § 109) provides that use of a structure for that purpose constitutes a nuisance, the Government argues that, inasmuch as he used the demised premises for the illicit manufacture of distilled liquor, petitioner had forfeited all rights in the premises, and the landlord thus acquired the right forcibly to enter to abate the nuisance, and that he could and did delegate that right to the officers. But it is clear that, before the officers made the forcible entry, the landlord did not know that the premises were being used for the manufacture of liquor, nor had he exercised his statutory option to forfeit the tenancy for such a cause. And the Supreme Court of Georgia has held that a proceeding to abate a nuisance under § 109 "must proceed for the public on information filed by the solicitor-general of the circuit." *Kilgore* v. *Paschall,* 202 Ga. 416, 417, 43 S. E. 2d 520, 521.

618

It follows that this search was unlawful, and since evidence obtained through that search was admitted at the trial, the judgment of the Court of Appeals must be

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE FRANKFURTER, concurring in the judgment.

Since searches and seizures play such a frequent role in federal criminal trials, it is most important that the law on searches and seizures by which prosecutors and trial judges are to be guided should be as clear and unconfusing as the nature of the subject matter permits. The course of true law pertaining to searches and seizures, as enunciated here, has not—to put it mildly—run smooth. The Court's opinion in this case is hardly calculated, I regret to say, to contribute to clarification. The reasoning by which the Court reaches its result would be warranted were *Trupiano* v. *United States,* 334 U. S. 699 (1948), still law. While the Court does not explicitly rely on it, underlying the present decision is the approach of *Trupiano.* That decision was a short-lived deviation from the course of decisions preceding it and it was specifically overruled by *United States* v. *Rabinowitz,* 339 U. S. 56, 66 (1950). Since the *Rabinowitz* case expresses the prevailing view, the decision in this case runs counter to it. The Court does rely on *Johnson* v. *United States,* 333 U. S. 10, although that case was seriously impaired by *Rabinowitz,* 339 U. S., at 66, dissenting opinion, at 85.

Surely it is fair to say that the lower courts and prosecutors have a right to proceed on the assumption, on the basis of controlling decisions, that whether or not a search is "unreasonable" turns on the circumstances presented by a particular situation, as a matter of substantive determination. On that test, I find it very difficult to conclude that a police officer may not deem adequate

the authorization of a landlord to enter his house without a search warrant where he has solid ground for believing that his lessee is utilizing the house as an illegal distillery. It seems to me that it is not at all "unreasonable" not to charge a local police officer with knowledge of the law of Georgia regarding the power of a landlord to abate a nuisance in his house. Apart from charging a policeman with knowledge of the local law relating to landlord and tenant, he certainly would not acquire that knowledge by reading the only Georgia case to which the Court's opinion refers, *Kilgore* v. *Paschall*, 202 Ga. 416, 43 S. E. 2d 520, a case which deals with the procedure of a solicitor general of a Georgia circuit in abating a nuisance by an injunction and tells nothing about the remedy of self-help by a landlord.

In joining the Court's judgment, I do so on the basis of the views set forth in my dissents in *Davis* v. *United States,* 328 U. S. 582, 594; *Zap* v. *United States,* 328 U. S. 624, 630; *Harris* v. *United States,* 331 U. S. 145, 155; *United States* v. *Rabinowitz, supra,* at 68. As these opinions elucidate, the Fourth Amendment incorporates a guiding history that gives meaning to the phrase "unreasonable searches and seizures" contained within it far beyond the meaning of the phrase in isolation and taken from the context of that history and its gloss upon the Fourth Amendment. The Amendment in its entirety in the setting of that history decidedly does not leave the phrase "unreasonable searches and seizures" at large.

MR. JUSTICE CLARK, dissenting.

The Constitution condemns only an *unreasonable* search. As my Brother FRANKFURTER says, that determination "turns on the circumstances presented by a particular situation." [1]

[1] I join in his opinion except for the last paragraph in which he concurs in the judgment of the Court.

As I read the record, Bridgaman had rented a house to Chapman. On a Sunday morning he called at the house to invite Chapman to church services. However, Bridgaman found Chapman gone, the house locked up and an "awful scent" of whiskey mash all over the place, including an open but empty cellar. He reported these facts to state officers and, at his suggestion, two officers accompanied him to the house. They too smelled, as the Court says, "a strong odor of 'whiskey mash' coming from the house."

Under Georgia law, the use of premises for the manufacture or the keeping of liquor for disposition works "a forfeiture of the rights of any lessee or tenant under any lease or contract for rent . . . ." [2] Bridgaman advised the officers he was the owner of the house, had it leased out, and "instructed" officer Harbin to enter it and "see what['s] what in there." The officers found a bathroom window unlocked. Bridgaman "told" the officers "to go in the window" and assisted in "boosting" officer Harbin into the window and on into the house. Inside, the officer found a still set up for operation and 1,300 gallons of whiskey mash in the vats. There was neither household furniture nor other evidence of residential occupancy.

The Court sets aside Chapman's conviction on the ground that this search without a warrant was "unreasonable." For the life of me I cannot see why this is true. I agree with a unanimous Court of Appeals that "under the circumstances of the search here made by the State officers, no illegality was shown."

The "reasonableness" of the search hinges on the rights of the landlord under Georgia law in such a situation.

---

[2] 58 Ga. Code Ann., § 106. Aside from eviction, there are no statutory procedural requirements as to forfeiture, the forfeit operating by virtue of § 106 at the option of the landlord.

This Court refuses to honor the clear language of § 106, apparently because the Government "cites no Georgia or other case" holding that a landlord may, under the circumstances here, enter on his premises. Instead, it bases its reversal on *Taylor* v. *United States,* 286 U. S. 1, and *Johnson* v. *United States,* 333 U. S. 10, involving entry by officers, unaccompanied by the landlord, into a *home* without a search warrant when there was ample time to secure one. This doctrine, established by *Trupiano* v. *United States,* 334 U. S. 699 (1948), was repudiated and specifically overruled only two years later in *United States* v. *Rabinowitz,* 339 U. S. 56, at 66. Furthermore, none of the cases cited by the Court involve the landlord-tenant circumstance controlling here.

As to Georgia law, the Court itself finds that "no Georgia case" holds that landlords have a right of entry as was exercised by Bridgaman here. It says that, first, the window was forced, second, the entry was for purposes of search and, third, affirmance would " 'leave [tenants'] homes secure only in the discretion of [landlords]' " (quoting from *Johnson, supra*). The obvious answer to that is: "Chapman was a tenant no more!" The statute provided for the forfeiture of his lease at his lessor's option when he began making whiskey on the premises. And Bridgaman so elected when he directed the officers to enter the house. It was Chapman who was the trespasser, not Bridgaman. The latter was merely repossessing his property, not abating a nuisance. Therefore, § 109 of the Georgia Code, cited by the Court, has no bearing here for that statute merely provides that the Attorney General "may" abate such a nuisance. It has no reference to landlords *qua* landlords. Indeed, the officers here could have abated the nuisance without judicial help by destroying the still and all of its paraphernalia under authority of 58 Ga. Code Ann. (Cum.

Supp. 1958) § 207.[3]  Likewise, *Kilgore* v. *Paschall,* 202 Ga. 416, 43 S. E. 2d 520, also cited by the Court, is entirely inapposite.  That case merely holds that the special statutory authorization, under an entirely different provision of the Georgia Code, § 110, to close up "blind tigers," *i. e.,* public places of disrepute where gambling, drinking, etc., are carried on, must be brought by the Solicitor of the county wherein they are located. But even if it did hold that actions under § 109 must be brought by the Solicitor, that ruling would have no effect here, precisely because the present factual situation does not come under § 109 but under § 106 and § 207, *supra.*

Furthermore, there was ample reason for not getting a warrant here.  It was Sunday afternoon and, as the Georgia officer testified, he had "never got one on Sunday."  "I don't think you can."  And this was buttressed by his further statements: "Well, I didn't feel no call to get one."  "The man that owned the house, he was there and he told us to go in the window and see what['s] what in there, so we went on in."  This shows a complete reliance by the officers on Bridgaman's direction to enter the house.  This, I say, made the search entirely reasonable and therefore valid under the Fourth Amendment.

Every moment of every day, somewhere in the United States, a law enforcement officer is faced with the problem of search and seizure.  He is anxious to obey the rules that circumscribe his conduct in this field.  It is the duty of this Court to lay down those rules with such clarity and understanding that he may be able to follow them.  For some years now the field has been muddy, but today the Court makes it a quagmire.  It fashions a novel rule, supporting it with an old theory long since over-

---

[3] Section 207 provides in pertinent part:
"[W]henever said apparatus [for making liquor is] . . . found or discovered by any sheriff, . . . the same shall be summarily destroyed and rendered useless by him without any formal order of the court."

ruled. If *Rabinowitz* is no longer law the Court should say so. It is disastrous to law enforcement to leave at large the inconsistent rules laid down in these cases. It turns the wellsprings of democracy—law and order—into a slough of frustration. It turns crime detection into a game of "cops and robbers." We hear much these days of an increasing crime rate and a breakdown in law enforcement. Some place the blame on police officers. I say there are others that must shoulder much of that responsibility.