Argued December 4, 1967, affirmed March 27, 1968

STATE OF OREGON, *Respondent, v.*
THOMAS WARREN PURVIS,
*Appellant.*
438 P. 2d 1002

*William Wiswall,* Springfield, argued the cause for

appellant.  With him on the brief were Sanders, Lively, Camarot & Wiswall, Springfield.

*John E. Moore,* Deputy District Attorney, Eugene, argued the cause for respondent.  With him on the brief was John B. Leahy, District Attorney, Eugene.

Before Perry, Chief Justice, and McAllister, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

O'CONNELL, J.

This is an appeal from a judgment of conviction for the crime of illegal possession of narcotics.

Defendant rented a room at the Eugene Hotel.  The Eugene Police Department was informed by employees of the hotel that they suspected defendant of using narcotics.  Detective Matoon of the Eugene Police Department went to the hotel and made inquiry of the manager of the hotel and other employees concerning defendant's activities.  Matoon, learning that defendant was occupying room 705 went up to the seventh floor of the hotel where he enlisted the help of two maids who were in the process of cleaning and making ready the rooms on that floor.  He asked them to keep the trash from room 705 separate from the trash collected from the other rooms.  He explained to them that he thought that defendant was using narcotics and that he wanted to examine the trash taken from the room for narcotics.  More specifically, he instructed them to look for "homemade cigarettes."  During this time the hotel manager came up to the seventh floor and instructed the maids to commence cleaning room 705.  The maids went into the room at approximately 2:30 p.m. and began cleaning the room.  They deposited all items which they regarded as waste or trash and

brought them out in a flat cardboard box to Matoon. If they had followed their usual procedure, they would have dumped the trash into a bag on their cleaning cart.

Matoon examined the contents of the receptacle brought to him while the maids returned to room 705 and resumed their cleaning. They then found on the floor between the bed and a chair a cigarette butt wrapped in a cardboard cover of a matchbook. They decided that this was what the officer was looking for so they brought it out to him. Matoon tentatively identified the butt as containing marijuana.

Thereafter Matoon sought out defendant and arrested him for illegal possession of narcotics. Following the arrest, the officer searched defendant and seized another cigarette butt similar in appearance to that which was found in the hotel room, a wax paper bag containing marijuana, and a book of brown cigarette papers.

It is the state's position that the police did not engage in an unlawful search and seizure because the hotel maids did not remove from the room any item which they would not have removed in the customary course of their work and that the only deviation in their usual cleaning procedure was to allow the police officer to examine the trash removed from the room.

Defendant first contends that the maids had no right to clean the room when they did because he had instructed them not to clean it until after he checked out. The maids' testimony left in doubt the precise instructions defendant gave them with respect to cleaning the room. We are of the opinion, however, that the evidence was sufficient to establish that when the maids entered room 705 at 2:30 p.m. they were privileged to enter.

The state takes the position that the maids did not engage in a search of the premises on behalf of the police, but simply performed their regular duties in cleaning the room. The only deviation from their normal method of cleaning the room, it is argued, was in allowing the police officer to examine the trash before it was dumped into the bag on the cleaning cart.

Officer Matoon testified as follows:

"*  *  * I had asked the maid cleaning the 7th Floor that when she cleaned Room 705, that I would like to see the contents that she would normally remove  *  *  *. I didn't ask them to look for anything in the room.  *  *  * I asked them if they would keep the trash from the room separate from the other trash that they had in their cart, so that I could examine it  *  *  *. That, as they thought Mr. Purvis was using narcotics, that I wanted to examine the contents of the room for any narcotics."

Ethel Simmons, one of the maids, testified as follows:

"Q. Can you tell us what the conversation [with Officer Matoon] concerned, to the best of your recollection?

"A. Something that we were supposed to be looking for when we cleaned the room.

"Q. What did he tell you to look for?
"A A homemade cigarette.

"Q. Then he told you, specifically to look for a homemade cigarette?
"A. Yes.

"*  *  *  *  *

"Q.  *  *  * [T]ell us what you did while you were in the room.

"A. Well, we were supposed to—We gathered

all the trash and took it so that the officer could look it over.

"＊ ＊ ＊ ＊ ＊

"Q. Now, when you were in the room, were you looking for cigarette butts for the officer?

"A. Yes.

"＊ ＊ ＊ ＊ ＊

"Q. As I understand your testimony, he told you to look for homemade cigarettes when you cleaned the room?

"A. Uh-huh.

"＊ ＊ ＊ ＊ ＊

"Q. And what did he tell you to do if you found any homemade cigarettes?

"A He wanted to look at it.

"Q. In other words, he told you to look for homemade cigarettes, and if you found any, he wanted to look at them?

"A Yes, we were to bring them to him.

"＊ ＊ ＊ ＊ ＊

"Q. You had been specifically directed by the police, or requested to look for cigarette butts and give them to them.

"A. Yes."

We interpret this testimony to mean that officer Matoon requested the maids to bring to him only those items, including homemade cigarettes or cigarette butts, which would normally be removed in the usual course of cleaning a hotel room.

If the officer had requested the maids to search for a cigarette without regard to whether it would be removed in the usual course of cleaning the room, a different problem would be presented. In such a case the direction to search would be broad enough to embrace items which would not be subject to a warrant-

less search and seizure by the police under the circumstances and a seizure of the property of defendant would therefore violate the Fourth Amendment and its counterpart in our own constitution.[1] It is arguable that under such circumstances the product of the search would not be admissible in evidence even if it consisted of an item which would have been removed by the maids in the usual course of cleaning the room without any direction from the police.[2] However, we are not required to decide that question in this case because, as we interpret the evidence, the trial court was entitled to regard the direction given to the maids as limited to the removal of items which would otherwise be removed in the normal process of cleaning the room.

---

[1] The maids' privilege to enter the room would not extend to the police. The applicable principle may be illustrated by Corngold v. United States, 367 F2d 1 (9th Cir 1966). In that case an airline employee had the right of inspection, as reserved by contract, to inspect airline baggage. At the request of custom authorities the employee opened a large package of defendant's and the agents proceeded to make a more thorough examination of the contents. The court, after concluding that the employee opened the carton solely to serve the purposes of the government, observed:

"But the evidence would be excludable in the present case even if the TWA employee had not acted solely to satisfy the government's interest in viewing the contents of the package, but instead had initiated and participated in the search for reasons contemplated by the inspection clause in TWA's tariff. The customs agents joined actively in the search." 367 F2d at 5.

[2] This conclusion can be supported on the theory that a prophylactic rule is essential to deter improper search practices. As said in Elkins v. United States, 364 US 206, 217, 80 S Ct 1437, 4 L ed2d 1669 (1960), "the exclusionary rule * * * is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it." Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan L Rev 608 (1967); A Comment on the Exclusion of Evidence Wrongfully Obtained by Private Individuals, 1966 Utah L Rev 271.

Under these circumstances a different problem is presented. The items collected by the maids were destined to be thrown away. The evidence in this case would support a finding that the maids were authorized by defendant to clean the room when they did and to remove the trash, including the cigarette butt found on the floor of the room. Defendant's claim to privacy terminated with respect to items discarded by him and which he impliedly authorized to be hauled away. Certainly, once the discarded items were outside of the room they were in the public domain and open to inspection by anyone.[9] And so, in the present case if the police had given no instructions to the maids and simply waited until the trash from room 705 was brought out into the hallway and then intercepted it, defendant would have had no legitimate claim to privacy in the items examined.[10] The same result would obtain if the assistance of the maids was enlisted only to the extent of requiring them to deliver the trash to the police so that it could be examined by them.

■ In the present case the maids were recruited by the police to carry on a form of search within the room, but only for items which had been discarded by defendant and which eventually would be available to the police for inspection even if no instructions had been given. Although the cooperation of the maids in

[9] See United States v. Minker, 312 F2d 632 (3d Cir 1962). In that case the defendant, who shared a trash receptacle situated on the premises but outside the building, had no standing to assert that an examination of the trash by government officials after it was picked up by the trash man was an unreasonable search. The agents seized adding machine tapes and other slips of paper which were linked to defendant by handwriting found on many of the items.

[10] Compare Work v. United States, 243 F2d 660 (D.C. Cir 1957). Likewise, if the maids acting without police direction had turned over to the police a product of their cleaning operation, defendant's constitutional rights would not have been invaded.

keeping the objects from room 705 separate from the objects taken from the other rooms was helpful to the police and, in fact, could be regarded as a part of the process of search, we do not think that the recruitment of the maids by the police for this purpose constituted an invasion of defendant's constitutional right of privacy.

■ The objects which defendant deposited in the ash trays and waste baskets can be regarded as abandoned property. During the time the discarded property remained in the room the police were not entitled to seize it, not because defendant claimed a right of privacy in these items, but because the right to the privacy of the room itself would be invaded by such a seizure. However, the removal of the contents of the ash trays and waste baskets into the hallway by the maids, who were privileged to be in the room and were authorized to remove trash in cleaning it, did not constitute an unlawful invasion of defendant's privacy. The cigarette butt found on the floor is not essentially different from the trash found in the ash trays and waste baskets. Although it may not have been actually abandoned, it was indistinguishable from the other items normally discarded by hotel guests and defendant, having at least impliedly authorized the removal of trash from the room, is not entitled to have the removal of the cigarette butt regarded any differently than the other trash in the room.

The judgment is affirmed.

SLOAN, J., dissenting.

The majority adopt the "silver platter" doctrine to searches conducted by hotel maids. The same rule would necessarily apply to any other person who can, at the insistence of government agents, permissively

enter an office or a home or any other place. It is rather shocking to realize that any unfaithful or naive employe or trusted neighbor can ransack a business office or home and bring to the waiting police whatever the searcher may choose to believe is debris. The majority imposes no other test. That, in itself, is bad enough, but the majority permit the police to instruct and direct the employe as to what he should look for. Even in the heyday of the silver platter rule, the Supreme Court would not tolerate the participation of federal agents in a search like that permitted by the majority today.

The rule, as enunciated in *Byars v. United States,* 1927, 273 US 28, at 33, 47 S Ct 248, 71 L ed 520, was that the federal government could "\* \* \* avail itself of evidence improperly seized by state officers operating entirely upon their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, participates in the wrongful search and seizure." And see, *Lustig v. United States,* 1946, 338 US 74, 69 S Ct 1372, 93 L ed 1819, where the federal officers waited until the state officers had entered a hotel room, with a key provided by the manager of the hotel, and searched the room and delivered the evidence to the federal officer. The court suppressed the evidence.

Another equally serious shortcoming is that this procedure "\* \* \* bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification \* \* \*." *Beck v. Ohio,* 1964, 379 US 89, 96, 85 S Ct 223, 13 L ed2d 142. Although the record is silent on the matter, it is altogether possible that the hotel manager's reason for

suspecting the presence of narcotics in the room would have justified a search warrant.

But it is claimed that what happened here was not a search because the maids were merely instructed to deliver to the officer the ordinary and usual debris. The evidence and the trial court's findings do not support such a conclusion. The trial court found that the maids were specifically directed to look for homemade cigarettes or cigarette butts. They were directed to look and search, not just perform the mechanical task of emptying wastebaskets. Furthermore, when the usual trash was brought to the officer, it did not contain the evidence he was exploring for. It required further searching by the maids to find the cigarette butt that contained marijuana. This cannot be glossed over as merely examining the contents of wastebaskets or ash trays—it was a search. The majority does admit that the cigarette butt was not abandoned. More significantly, neither was the room abandoned. In *Abel v. United States,* 1960, 362 US 217, at 241, 80 S Ct 683, 4 L ed2d 668, the court only approved the search for trash in a hotel room as abandoned property "for the reason that at the time of the search petitioner had vacated the room."

But more importantly, and why it is substantially identical to the silver platter doctrine, it allows the use of an agent to accomplish what the police cannot do.

In *Katz v. United States,* 1967, 389 US 347, 88 S Ct 507, 19 L ed2d 576, the court struck down two untenable doctrines it had previously followed. One, was that a trespass into a prohibited area was necessary before a search was unlawful and secondly, that the police could not use an electronic aid to gain access to evidence that was otherwise inaccessible. The court

also was emphatic that the right to unlawful intrusion followed the person—it was not defined or limited by an enclosure or by the extent or kind of an enclosure. The court summarized many of its prior decisions in this language: "In the absence of such safeguards, [search warrant] this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." 389 US at 356, 88 S Ct 514, 19 L ed2d 585. It would be a mistake to assume that *Katz* is limited to the use of a mechanical agency, not a human one. *Katz* prevents any invasion, no matter how limited, without constitutional safeguards.

As long ago as *Gouled v. United States,* 1921, 255 US 298, 41 S Ct 261, 65 L ed 647, the court prohibited this kind of intrusion. The court's language in *Gouled* is worthy of quotation:

"The prohibition of the Fourth Amendment is against all unreasonable searches and seizures and if for a Government officer to obtain entrance to a man's house or office by force or by an illegal threat or show of force, amounting to coercion, and then to search for and seize his private papers, would be an unreasonable, and therefore a prohibited search and seizure, as it certainly would be, it is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth instead of by force or coercion. The security and privacy of the home or office and of the papers of the owner would be as much invaded and the search and seizure would be as much against his will in the one case as in the other, and it must therefore be regarded as equally in violation of his constitutional rights.

"Without discussing them, we cannot doubt that such decisions as there are in conflict with this conclusion are unsound, and that, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the Government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, *any search and seizure subsequently and secretly made in his absence* falls within the scope of the prohibition of the Fourth Amendment, \* \* \*." (Emphasis supplied). 255 US at 305, 306, 41 S Ct 263, 264, 65 L ed 651.

*Gouled* was tacitly overruled in *Warden v. Hayden,* 1967, 387 US 294, 87 S Ct 1642, 18 L ed2d 782, but only to the extent that *Gouled* had held that a search warrant did not permit the seizing of mere evidence, a part of the *Gouled* opinion unrelated to the foregoing quotation. The majority are unable to cite a single authority that permits the conduct allowed by the majority in the instant case and denounced in the above quote.

The cases that are somewhat similar to the instant situation have reached the result required by *Gouled.*

*Stoner v. California,* 1964, 376 US 483, 84 S Ct 889, 11 L ed2d 856, is important because it refutes and denies the argued right of a hotel employe to permit entry into an occupied hotel room in the absence of the occupant of the room. It does not answer this condemnation to say in the instant case that the employes entered in the usual course of hotel cleaning. This is sophistry. The employes entered at the direction of the police, consented to by the manager and contrary to the express order of defendant.

In *Chapman v. United States,* 1961, 365 US 610,

81 S Ct 776, 5 L ed2d 828, the court suppressed distilling equipment found by officers when they were led, by the landlord, into a house occupied by a tenant for the ostensible purpose of checking alleged waste to the premises. The court there recognized the subterfuge for what it was. *McDonald v. United States,* 1948, 335 US 451, 69 S Ct 191, 93 L ed 153, involved entry into a room in a rooming house after the officers were aware that a crime was being committed in the room. In *McDonald,* as here, the prosecution argued that the police had no probable cause to obtain a warrant. The court responded by saying there was no evidence of an emergency or other exceptional circumstances that "* * * excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." 335 US at 456.

In *Johnson v. United States,* 1948, 333 US 10, 68 S Ct 367, 92 L ed 436, the court denounced entry into a hotel room from which the smell of opium was coming.

The substance that comes through the grist mill of these and many other cases beginning in specific language, with *Agnello v. United States,* 1925, 269 US 20, 33, 46 S Ct 4, 6, 70 L ed 145, 149, 51 ALR 409, 414, after observing that no state or national statute or court had permitted entry into a house without a warrant except in extreme cases, the court said "Absence of any judicial approval is persuasive authority that it is unlawful. * * * Belief, however well founded, that an article is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." There have been some exceptional de-

partures from this rule, as in the questionable decision of *Ker v. California,* 1963, 374 US 23, 83 S Ct 1623, 10 L ed2d 726, but the more recent cases repeatedly cite the language just quoted and add to it that no matter how discriminating the officer may be in his intrusion into protected rights, it is bad; and that "* * * the reach of that amendment cannot turn upon the presence or absence of a physical intrusion into a given enclosure." *Katz v. United States, supra,* 19 L ed2d 583.

This protection fails when, and only when, the person voluntarily exposes the evidentiary material or it is seized after lawful arrest. If there is doubt of that statement it can be further verified by examining the opinion in *Rios v. United States,* 1960, 364 US 253, 80 S Ct 1431, 4 L ed2d 1688, where the court set aside a conviction for concealment of narcotics based on the search of a taxicab occupied by defendant Rios. The case was remanded for a determination as to whether or not the defendant had voluntarily exposed the narcotics before the police arrested him. In the absence of such a showing, the search was invalid. This also is the clear impact of *Lewis v. United States,* 1966, 385 US 206, 87 S Ct 424, 17 L ed2d 312.

In *State v. Cartwright,* 1966, 246 Or 120, 418 P2d 822, cert den 386 US 937, February 20, 1967, the majority mistakenly held that so long as there was no physical intrusion into protected rights that exploratory search was permissible. Here, the majority say the same thing only here the intrusion is by human aid. The distinction cannot be sanctioned for long and sooner or later the intrusion permitted by the majority must be overruled. The obvious connotations of this decision are too vicious to last.

The evidence should be suppressed.