Argued and submitted February 22, 2021, affirmed March 23, petition for review denied July 28, 2022 (370 Or 197)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL LEROY LANEY,
aka Michael Laney,
*Defendant-Appellant.*

Multnomah County Circuit Court
18CR26017; A171485

507 P3d 308

Defendant appeals his convictions on two counts of first-degree sexual abuse. While moving out of a home that his daughter and her family were moving into, defendant left five computers in the garage and asked his then-son-in-law Parks to destroy them. Defendant and Parks never spoke about the matter again. Parks failed to follow through and eventually decided to keep the hard drives for his own use. At one point, Parks connected the hard drives to his own computer to see whether they still worked, and he saw a photo of a naked young girl jumping into a pool at a home that defendant used to own. Approximately six years after defendant left the computers with Parks, the police began investigating an allegation by defendant's granddaughter that defendant had raped her as a child. Parks told the police about the photo that he had seen and turned over the hard drives. The police obtained a warrant, searched the hard drives, and found numerous photos of naked girls and women. Before trial, defendant moved to suppress, arguing that the search violated Article I, section 9, of the Oregon Constitution. In response, the state argued, among other things, that defendant had abandoned his property interest in the hard drives before the police searched them. The trial court agreed and denied the motion to suppress. *Held*: The court did not err by denying defendant's motion to suppress. Some of the trial court's reasoning is no longer viable in light of *State v. Lien/ Wilverding*, 364 Or 750, 759, 441 P3d 185 (2019), which was decided shortly after defendant's trial. However, considering all of the relevant factors, the court's conclusion—that defendant abandoned his property interest in the hard drives— was correct.

Affirmed.

Benjamin N. Souede, Judge.

Stephen A. Houze argued the cause and filed the reply brief for appellant. On the opening brief was Jacob G. Houze.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Armstrong, Senior Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

Defendant was convicted of two counts of first-degree sexual abuse. On appeal, in his third assignment of error, defendant contends that the trial court erred by denying his motion to suppress photos found on a computer hard drive that defendant had given to his then-son-in-law six years earlier with instructions to destroy. We write only to address that issue. For the reasons explained below, we conclude that the trial court correctly denied the motion to suppress, because defendant had abandoned his possessory and privacy interests in the hard drive, constitutionally speaking, by the time it was searched. As for defendant's other assignments of error, we reject the first and second assignments of error in light of our resolution of the third assignment. We reject the fourth assignment of error, in which defendant challenges the denial of his motion for judgment of acquittal on both charges, because the evidence was legally sufficient for defendant to be found guilty. We reject the fifth assignment of error, in which defendant argues that the trial court erred by striking certain testimony, because the court did not err in striking that testimony as irrelevant. Accordingly, we affirm.

### FACTS[1]

Parks married defendant's daughter. Their daughter, E, was born in 2002.

In late 2010 or early 2011, defendant and his wife were moving from Oregon to California, and Parks and his family were moving into the house that defendant and his wife were vacating. While defendant was moving out, he and Parks were standing in the garage. Defendant pointed to five computers that were sitting in the garage, and they "talked about recycling them." Parks does not remember whether defendant asked him to do it or whether he volunteered. Parks also does not remember whether they used the term "recycling," but the idea was to dispose of them. Defendant asked Parks "to remove the hard drives and to

---

[1] The only relevant witness at the pretrial hearing was Parks. Except for procedural facts, or as otherwise noted, the facts herein are taken from Parks's pretrial testimony.

destroy them with a hammer so that they were, you know, unusable or unreadable." They did not discuss why defendant wanted them destroyed. Parks assumed that it was a "privacy type of thing," in that Parks uses computers, knows that "stuff can be stored on computers," and thinks it is "better to destroy it so other people can't look at it." He did not perceive defendant to be wanting to destroy anything specific on the computers. Parks said or indicated "okay." At that time, it was Parks's intention to destroy the computers.

Parks's conversation with defendant about the computers "wasn't a long conversation" and "was just part of the, let's do this and let's do that type of stuff of moving." Parks and his family had generally been helping defendant and his wife with their move over a period of weeks, including helping with packing and moving boxes. Defendant had asked Parks to get rid of a number of items that he and his wife did not want to take with them, including unusable household items and some old shotguns.

Parks and his family were going through a difficult time in the period when defendant and his wife were moving to California. Their house was in foreclosure, they were moving, and Parks had just started a new job that had him working 50 to 60 hours a week. Dealing with the computers was not his priority, so he put them in his storage unit.

In 2012, Parks separated from his wife and moved back to their old house, which was still in foreclosure. In late 2014 or early 2015, Parks decided to empty out their storage unit. He found the computers, thought it was "silly" that he was hanging onto them, and remembered that defendant had asked him to take out the hard drives. Parks removed the hard drives from four computers and, except for the hard drives, recycled those four computers at an e-waste site. He kept the fifth computer, as well as the four hard drives, thinking he might be able to use them for work. Parks is a digital artist, so "hard drive space is important" to him, and hard drives were more expensive then than they are today. Parks hooked up each of the hard drives to his computer to see if they still worked. In the process, he looked at the content of one drive and saw a photo of a naked little girl, aged five or so, jumping off a diving board into a pool. Parks

recognized the house as one that defendant used to own in California. He was disturbed by the photo. He noticed that the drive contained other photo files, but he did not open them, because the one photo bothered him and he did not want to see anything else.

After Parks took the computers out of his storage unit and recycled the four boxes (less hard drives), Parks kept the fifth computer and the four hard drives at his old house that was still in foreclosure—where he had been staying during the separation—and later put them into his new storage unit when he moved from the foreclosed house into a rental. Parks never talked to defendant about the fact that he still had the computers, and defendant never asked about them. After 2012, when Parks and his wife separated, Parks mostly lost touch with defendant, communicating with him maybe once.

In 2017, E accused defendant of raping her as a child. During the ensuing investigation, Parks mentioned the hard drives to a detective. Parks initially denied looking at any files, but he later told the detective about the photo he had seen of a naked little girl jumping into defendant's pool. Parks consented to the police taking the hard drives. Defendant had not talked to Parks about the hard drives in the six or so years since leaving them in his old garage. The police obtained a search warrant and, on one of the drives, found numerous photos of naked prepubescent and postpubescent girls.

Defendant was indicted on 10 counts of first-degree rape and first-degree sexual abuse. Before trial, he moved to suppress the photos. The state opposed the motion, and it filed its own motion to admit the photos as evidence of defendant's sexual interest in children. The state argued, among other things, that defendant had abandoned his property interest in the hard drives before the police searched them.

The trial court agreed with the state on abandonment. The court described the evidence as showing that defendant had asked Parks to destroy the hard drives left in the garage while defendant was moving out, that Parks "nodded or otherwise softly assented or that he certainly acknowledged the

request," and that defendant never said anything more about it. The court concluded that, whatever defendant's motive was for asking Parks to destroy the hard drives, his actions constituted abandonment, as he relinquished both his "possessory and privacy interest in the hard drives." Defendant voluntarily "turned over their physical control entirely to Mr. Parks," knowing that his request to destroy them "wasn't binding," and having "no particular reason to believe that things would go exactly as he asked." As the court put it, defendant "had made a request" of a family member, and "everyone has the experience of knowing that family members don't always do what we ask them to do." The court therefore granted the state's motion and, relatedly, denied defendant's motion to suppress. The court also denied a separate motion in which defendant challenged the warrant, reasoning, among other things, that defendant could not challenge a warrant pertaining to property that he had abandoned.

The trial court ruled on the admission of the photos on April 30. The charges against defendant were then tried to the court over several days (defendant had waived his right to a jury trial), and the court announced its findings on May 7. The court found defendant guilty of four counts of first-degree sexual abuse, which, after merger, resulted in two convictions. It acquitted him of the remaining charges.

At defendant's sentencing hearing a month later, the court and the parties discussed the fact that, on May 9, the Oregon Supreme Court had issued its opinion in *State v. Lien/Wilverding*, 364 Or 750, 441 P3d 185 (2019). Both parties agreed that *Lien/Wilverding* was a significant new decision on abandonment of property rights under Article I, section 9, but they disagreed as to its import. Defendant argued—in connection with requesting a stay of execution of his sentence—that, given *Lien/Wilverding*, the Court of Appeals would likely overturn the trial court's ruling on the admission of the photos. The state disagreed, arguing that *Lien/Wilverding* was distinguishable, that the trial court's abandonment ruling was correct even though some of its specific reasoning was no longer valid, and that the court's warrant ruling was an independent basis for admission of the photos in any event. Ultimately, the trial court denied defendant's motion. The court expressed uncertainty as to

what the Court of Appeals would make of *Lien/Wilverding*, as far as affirming or reversing the court's abandonment ruling in this case—describing the situation as a "jump ball"—but denied the requested stay.[2]

## ANALYSIS

Article I, section 9, of the Oregon Constitution protects people against unreasonable searches and seizures. A person who "has actual or constructive possession of property immediately before it is searched *** has a constitutionally protected possessory interest in that property." *State v. Standish*, 197 Or App 96, 99-100, 104 P3d 624, *rev dismissed as improvidently allowed*, 339 Or 450 (2005). A person also may have a constitutionally protected privacy interest in property, even without a possessory interest. *Lien/Wilverding*, 364 Or at 759 (recognizing two discrete interests). At the same time, a person may abandon a constitutionally protected property interest by voluntarily manifesting the intention to do so. *State v. Cook*, 332 Or 601, 608, 34 P3d 156 (2001). If a person has abandoned any and all constitutional interest in an item of property, the police need not obtain a warrant to search or seize that property—and, if the police do obtain a warrant, as a precaution or otherwise, the person who abandoned their interest is not in a position to challenge the warrant. *See id.*

Defendant contends that the trial court erred in ruling that, for purposes of Article I, section 9, he abandoned his property interest in the hard drive on which the photos of naked children were found.[3] In response, the state

---

[2] The stay issue is not relevant on appeal. We mention the discussion that took place at the sentencing hearing primarily because, in his reply brief, defendant asserts that the prosecutor "conceded" at the sentencing hearing "that the central premise of the State's abandonment argument was explicitly disavowed by the Oregon Supreme Court in [*Lien/Wilverding*]," and he suggests the state has acted improperly by arguing on appeal that *Lien/Wilverding* changed the abandonment analysis but does not change the ultimate result in this case. We see nothing improper in the state's argument on appeal, nor do we view it as conflicting with the prosecutor's remarks at the sentencing hearing.

[3] Defendant also relies on the Fourth Amendment to the United States Constitution, but he makes no arguments unique to the Fourth Amendment. *See State v. Dickson*, 173 Or App 567, 573, 24 P3d 909, *rev den*, 332 Or 559 (2001) (recognizing that the Oregon and federal standards are similar). We therefore limit our written discussion to Article I, section 9.

maintains that the trial court's ruling was correct, although it acknowledges that some of the court's expressed reasoning is no longer viable, in that it relied on a reading of *State v. Howard/Dawson*, 342 Or 635, 157 P3d 1189 (2007), *overruled by State v. Lien/Wilverding*, 364 Or 750, 441 P3d 185 (2019), and *State v. Purvis*, 249 Or 404, 438 P2d 1002 (1968), *overruled by State v. Lien/Wilverding*, 364 Or 750, 441 P3d 185 (2019), that was disavowed in *Lien/Wilverding*.

Determining "whether a defendant has relinquished a constitutionally protected interest in an article of property involves both factual and legal questions, which this court reviews in the same manner that it reviews other search or seizure questions arising under Article I, section 9." *Cook*, 332 Or at 607. We defer to the trial court's findings of fact if supported by the evidence but determine as a matter of law whether those facts are sufficient to constitute abandonment. *State v. Lewis*, 306 Or App 492, 499, 474 P3d 907 (2020). It is the state's burden to prove by a preponderance of the evidence that a defendant abandoned his interest in a given item of property. *Id*.

We have previously identified six factors that may be relevant in assessing abandonment: (1) whether the defendant separated himself from the property as a result of police instruction or illegal police conduct; (2) whether the defendant left the property on public or private property; (3) whether the defendant attempted to hide the property or otherwise manifest to the police an intention of maintaining control over it; (4) whether the defendant left the property under circumstances that make it objectively likely that others will inspect it; (5) whether the defendant placed the item in plain view; and (6) whether the defendant gave up his rights to control the disposition of the property. *State v. Ipsen*, 288 Or App 395, 399-400, 406 P3d 105 (2017).

Not all of those factors will be relevant in every case—it depends on the circumstances—nor is any one factor dispositive. *See State v. Bunch*, 305 Or App 61, 69, 468 P3d 973 (2020). Moreover, because many abandonment cases involve situations in which a person is separated from property during a police encounter or leaves property in a public

place,[4] some factors are phrased in a way better suited to those scenarios, but they may still reflect underlying principles, in which case we look to the underlying principles. *See id.* at 69 (considering all six factors but noting that most were not "directly relevant" to the case, "because they relate to a circumstance where the police recover property after the person has left it behind"). Lastly, we note that some factors may bear more on the possessory interest, while others may bear more on the privacy interest.[5] Ultimately, we "examine the totality of the circumstances" to determine whether the defendant "has abandoned protected possessory or privacy interests." *State v. Kauffman*, 162 Or App 402, 407, 986 P2d 696 (1999), *rev den*, 329 Or 650 (2000).

Here, defendant summarily asserts that all of the *Ipsen* factors, except the first factor, favor him. We are unpersuaded. In our view, the state presented sufficient evidence to prove abandonment by a preponderance of the evidence, taking into account the relevant *Ipsen* factors and the totality of the circumstances.

One factor clearly favors defendant—that he left the computers on private property. That is a significant fact that, in appropriate circumstances, would strongly suggest an ongoing property interest. In these circumstances, however, the other factors outweigh that fact. To begin with, defendant voluntarily separated himself from the computers. He could have taken them to California, or to the dump, but instead he voluntarily left them in the garage of the house

---

[4] *See Ipsen*, 288 Or App at 396 (hidden camera left plugged into outlet near the sink in a coffee shop bathroom); *see also, e.g.*, *State v. Lewis*, 306 Or App 492, 501, 474 P3d 907 (2020) (backpack left on the back seat of a stolen truck parked in a gas station parking lot); *State v. Montiel-Delvalle*, 304 Or App 699, 709, 468 P3d 995, *rev den*, 367 Or 387 (2020) (damaged vehicle left in a public intersection); *State v. Bernabo*, 224 Or App 379, 383, 197 P3d 610 (2008) (sunglasses case left on the ground near a public trash can); *State v. Stafford*, 184 Or App 674, 676, 57 P3d 598 (2002), *rev den*, 335 Or 181 (2003) (wadded-up paper bag left in the communal stairway of a fourplex).

[5] As discussed more later in the opinion, the Supreme Court's recent decision in *Lien/Wilverding* draws attention to the potential divergence between a person's possessory and privacy interests in property. *See Lien/Wilverding*, 364 Or at 760 n 2 ("[A]s our precedents reflect, a person's possessory interest in property is not the touchstone of whether a person has a privacy interest protected by Article I, section 9."); *but see also id.* at 783 (Kistler, J., dissenting) ("Ordinarily, a person who gives up all possessory interests in property retains no privacy interest in it.").

that he was vacating and where he would have no further ability to control what happened to them. Next, although minimally relevant here, defendant did not hide the computers somewhere that Parks and his family would be unlikely to find them, as he might have done if he intended to return for them and did not want them inspected in the meantime. He left them in plain view in the garage, drew Parks's attention to them, and left their control and disposition to Parks, albeit with instructions.

The fourth and sixth factors—which are related here—are the most significant. We agree with the state that, under the circumstances, the likelihood of Parks not following defendant's instructions, particularly in the absence of any further discussion, was sufficiently high to weigh in favor of abandonment. Relatedly, although defendant asked Parks to destroy and dispose of the computers, he fundamentally gave up the right to control their disposition once he left them in the garage.

Several facts are relevant to the foregoing points. First, defendant asked his son-in-law to do him a favor—to destroy and dispose of five unwanted computers that he did not want to take to California with him—just as he had asked Parks to dispose of certain unusable household items and some old shotguns that he did not want to take. Parks did not work for a disposal or recycling company, nor was defendant paying him for a contracted service. Parks was simply helping a family member with an out-of-state move. Second, Parks acknowledged defendant's request—he "nodded or otherwise softly assented"—and subjectively intended to follow through at the time. However, Parks did not give defendant any strong assurances, nor did defendant seek any strong assurances. There is no evidence that defendant had reason to believe that Parks was unusually reliable, no matter how weakly he committed to a task. Third, it is generally foreseeable that a family member might not follow through on a favor. As the trial court put it, "everyone has the experience of knowing that family members don't always do what we ask them to do." Despite that very real possibility, defendant never spoke with Parks about the computers again. Parks had a lot on his plate when defendant made his request, and, the next year, he separated

from defendant's daughter and moved out of the house. At no point did defendant check with Parks to see if he had gotten rid of the computers. Not only was it entirely feasible that Parks might have forgotten or failed to follow through, it would not be particularly surprising for a family member to decide to keep an unwanted item that another family member had left to be discarded.

This case bears some similarity to *Kauffman*. There, the defendant's vehicle left the road, crossed railroad tracks, and rolled over. 162 Or App at 404. Another vehicle stopped to offer assistance. *Id.* The defendant asked two boys who were passengers in that vehicle for help removing items from his car. *Id.* He then asked one of the boys to take a large blue duffel bag that he had removed from his car and hide it in the bushes, which the boy did. *Id.* When police officers arrived shortly thereafter to investigate the crash, the boys told them about the hidden bag. *Id.* at 404, 408. The officers retrieved the bag, searched it, and found illegal drugs. *Id.* at 405. We held that the trial court did not err in denying suppression of the evidence, because the defendant had abandoned his possessory interest in the bag before the police searched it. *Id.* at 408. The defendant "surrendered any control that he may have had in the bag when he chose to turn it over to strangers and then walk off down the railroad tracks," at which point the boys "were in a position to follow defendant's instructions, leave the bag near defendant's vehicle or, as they did, hide it and then report its location to the appropriate authorities when they arrived on the scene." *Id.*

Here, defendant may have expected Parks to destroy the computers as defendant had requested. However, that result was not certain, defendant chose to take the risk that Parks would not act as instructed, and defendant never did anything to follow up or reassert control over the computers. In turning over the computers to Parks in the manner that he did and then simply leaving for California, defendant gave up the right to control their disposition.[6] And, even if

---

[6] At one point, defendant characterizes his leaving the computers with Parks as a "bailment." That characterization is inapt on these facts. *See Kantola v. Lovell Auto Co.*, 157 Or 534, 535, 72 P2d 61 (1937) (A bailment is "a delivery

defendant arguably did not abandon his privacy interest in the computers at the very moment that he turned them over to Parks, he had done so by the time that the police searched them, which was at least six years after defendant left them behind—six years during which defendant never once followed up with Parks. Defendant refers to the "sanctity of electronic devices" and points to Parks's unspoken assumption that defendant wanted the computers destroyed for commonsense "privacy" reasons. However, we are unpersuaded that electronic devices are so unique that a person's privacy right in their contents can never be found to have been abandoned.

Finally, we consider the effect of the Supreme Court's recent decision in *Lien/Wilverding*.[7] In its pretrial arguments, the state compared the computers in this case to abandoned garbage, citing *Howard/Dawson*, 342 Or at 638—in which the Supreme Court held that it did not violate Article I, section 9, when the police went through the defendant's garbage after the sanitation company picked it up on the regularly scheduled pick-up day and delivered it to the police—and *Purvis*, 249 Or 404—in which the Supreme Court held that it did not violate Article I, section 9, when two hotel employees, acting at the direction of a police detective, gathered trash in the defendant's hotel room while cleaning, kept that trash separated from the trash from other rooms, and delivered it to the detective for inspection. The trial court was persuaded by that argument and relied on it, at least in part, in ruling on the admission of the photos.

Two weeks later (after the conclusion of defendant's trial), the Supreme Court revisited *Howard/Dawson* and *Purvis* in *Lien/Wilverding*. In *Lien/Wilverding*, police officers obtained incriminating items from the defendants' garbage "by having a sanitation company manager specially pick up defendants' garbage bin on trash pick-up day, transport it to

---

of something of a personal nature by one party to another, to be held according to the purpose or object of the delivery, and to be returned or delivered over when that purpose is accomplished."); *Black's Law Dictionary* 174 (11th ed 2019) ("Unlike a sale or gift of personal property, a bailment involves a change in possession but not in title.").

[7] We apply the law in effect at the time of appeal. *State v. Jury*, 185 Or App 132, 136, 57 P3d 970 (2002), *rev den*, 335 Or 504 (2003).

the sanitation company's facilities, and turn it over to the officers, who then searched the bin." 364 Or at 752.

The court declined to decide whether the *Lien/ Wilverding* defendants retained a possessory interest in their curbside garbage, instead considering only whether they retained a privacy interest. *Id*. at 758. Relying on "social and legal norms," the court concluded that they did. *Id*. at 760-64. The court acknowledged how "outraged" most Oregonians would be if they learned that their sanitation company had separated out their trash from everyone else's and given it to the police, a neighbor, or any of a litany of curious third parties—rather than commingling it with the other garbage picked up on the route and taking it to a landfill, as one would expect. *Id*. at 760-61. The court noted that the sanitation company had an "exclusive franchise in the city" and that the defendants "were obligated by city ordinance to remove waste from their home on at least a weekly basis." *Id*. at 760, 764. The court recognized that it was construing our state constitution to provide greater protection than the Fourth Amendment, as construed by the United States Supreme Court, and pointed to other state courts that have done the same under their state constitutions. *Id*. at 765-66. It expressed its agreement with those other state courts "that people do not voluntarily expose their private effects to government officials when they place their garbage in opaque, closed garbage bins at curbside for collection by their community's garbage hauler." *Id*. at 766-67.

The court then turned to the issue of the sanitation company manager acting "as an agent of the police when he picked up defendants' garbage bin and delivered it to the police for a search." *Id*. at 767. "It is axiomatic * * * that Article I, section 9, applies only to government-conducted or -directed searches and seizures, not those of private citizens." *Id*. It was "undisputed that the police solicited the sanitation company manager to specially pick up and bring defendants' garbage to them," and the trial court found that the manager had "acted exclusively at the request and direction of the police." *Id*. at 768 (internal quotation marks omitted). In that context, the court acknowledged that *Purvis* and *Howard/Dawson* could be read as "broadly holding that, once a private actor takes possession of a person's

garbage"—as the sanitation company employees did in *Lien/ Wilverding*—any privacy interest in the garbage is immediately lost. *Id*. at 769-70. The court "renounce[d]" that broad reading, concluding "that Oregonians do not 'lose' privacy interests in their garbage when the police direct a private actor to facilitate the government's search by picking up garbage bins left at curbside for regular trash pick-up day." *Id*. at 770. It disavowed *Purvis* and *Howard/Dawson* to the extent that they held otherwise. *Id*.

Returning to the present case, we are unpersuaded that *Lien/Wilverding* affects the outcome here. Certainly, a portion of the trial court's stated reasoning in ruling on the admission of the photos is no longer viable after *Lien/ Wilverding*. But it does not follow that the result is no longer correct. This case involves defendant leaving several unwanted computers with his son-in-law, a private citizen, with instructions to dispose of them. The issue is whether defendant abandoned his constitutional interest in the computers by doing so, either immediately or after six years had passed without his making any effort to determine their fate. This case does not involve the police enlisting agents to interfere with the normal processes by which garbage is transported from people's residences to the landfill, a crucial feature of *Lien/Wilverding* (and also a feature of *Purvis* and *Howard/Dawson*), or anything analogous to that. Parks received the computers from defendant by early 2011. He promptly failed to follow through on disposing of them, decided to keep the hard drives for his own use by early 2015, and first had contact with the police in May 2017.

As *Lien/Wilverding* makes clear, there are circumstances in which a person retains a privacy interest in disposed items, regardless of whether the person still has a possessory interest, including when garbage is placed in an opaque bin and left at the curb for pickup by the local sanitation company. That does not mean, however, that everyone retains a privacy interest in everything that they discard, by any means, forever, and that it is no longer possible to abandon one's privacy interest in discarded items. To the extent defendant contends that he retained a privacy interest in the computers even if he no longer had a possessory

interest, we are unpersuaded that defendant's privacy interest survived his abandonment of his possessory interest in this case—or at least we are unpersuaded that it survived it by six years. Although *Lien/Wilverding* highlights the potential divergence between possessory and privacy interests, both aspects of a person's constitutionally protected property interest have always been recognized. *See, e.g.*, *Kauffman*, 162 Or App at 408 (stating that we examine the totality of the circumstances to determine whether the defendant "has abandoned protected possessory or privacy interests"). In this case, the trial court expressly concluded that defendant had relinquished *both* his "possessory and privacy interest in the hard drives," and we agree that the evidence was sufficient for the court to conclude that the state had met its burden of proof on this record.

Accordingly, the trial court did not err by allowing into evidence the photos from the hard drive. That resolves the first three assignments of error, and, as previously noted, we reject the fourth and fifth assignments on the merits without written discussion.

Affirmed.