**Raymond Duane SPRING, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 60160.**

Court of Criminal Appeals of Texas, Panel No. 2.

Dec. 2, 1981.

Rehearing Denied Jan. 20, 1982.

Tom E. Hill, Fort Worth, for appellant.

Tim Curry, Dist. Atty., William Kane, Steve Chaney and James J. Heinemann, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

OPINION

CLINTON, Judge.

This appeal is taken from a conviction on May 18, 1978 for the offense of burglary of a habitation. Trial was before a jury that returned a verdict of guilty and subsequently found the allegations of two prior felony convictions as contained in the indictment to be true. Punishment was accordingly set at life imprisonment.

By his first two grounds of error appellant complains of the trial court's denial of his motion to suppress certain evidence introduced at his trial that was seized from his apartment while he was confined in the Bedford City jail. He argues first that the initial intrusion was conducted without a search warrant in violation of his Fourth Amendment rights and, secondly, that the search warrant that was later obtained failed to comply with the requirements of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). We agree for reasons about to be discussed, with the first contention, and we find it subsumes the second.

The record reflects that the alleged burglary occurred in Arlington on November 12, 1977. Appellant and his wife were arrested at approximately 4:00 a. m. on December 12, 1977 in Bedford and were confined in the Bedford City jail. Later that same morning a Bedford police officer telephoned Fort Worth police officer Woods and asked that appellant's apartment be kept under surveillance until the Bedford police arrived with a search warrant.[1] Detective Woods and Detective Camfield drove near and identified appellant's apartment at approximately 11:30 a. m., parked their vehicle some 75 to 100 yards away where they could view the front door of appellant's apartment, and waited.

After an hour passed they saw a man, soon to be identified as appellant's father, Duane Spring, approach the door. Mr.

Spring removed a United Parcel note from the door and was returning to his car when Woods and Camfield stopped him, identified themselves as policemen, and asked him for identification. Mr. Spring said he was there to pick up some baby things for his grandchild, the small baby of appellant and his wife.

Meanwhile a Bedford police officer had also called Ms. Shirley Crites, manager of the complex that included appellant's apartment. She was told that appellant had been arrested for burglary and was then in the Bedford jail. As to the remainder of the telephone conversation, Crites testified:

"Q: Did they ask you in the course of that telephone conversation to search the apartment, or to look at the apartment number 119 to see if there were any stolen items?

A: They told me to go over—they asked me if I could legally go over and inspect the apartment to see if there was anything wrong there, if anything looked out of order, anything unnormal.

    *     *     *     *     *     *

Q: Well, you wouldn't have gone over there otherwise that day and that morning, would you?

A: If he hadn't have called, I wouldn't have known there was a problem. But since I was manager of the property, it was up to me to see, you know, to get an opinion of what was going on in that apartment, because it was on my property.

    *     *     *     *     *     *

Q: [By Defense Attorney]: The question I asked you that was not answered was, as a result of the telephone conversation, the Bedford Police Department, where you got the idea that you were, that there may be some stolen items in the apartment, you proceeded to that apartment, did you not?

---

1. In response to questions by the judge Woods pinpointed the request made by the Bedford police officer—to "make sure no one removed items that could be evidence for them," further explaining that Bedford reported that appellant "had been caught in a burglary" and they "had reason to believe there was other items in the apartment taken from burglaries in their city." The apartment number given was 119.

A: Right. Had they not called, you know, I would not have been aware of anything, you know.

Q: Okay. Fine. So then you proceeded to the apartment, is that not correct?

A: Right.

Taking her maintenance man along, Crites went to carry out her mission. As she neared apartment 119, the way she remembered it, Duane Spring approached her and told her he was appellant's father, was going to be taking care of his grandbaby and needed some baby things, formula, clothes, diapers and the like, from the apartment.[2] According to Detective Woods, Crites replied "that she thought it would be all right and *I assumed it would*."[3] Crites recalled:

"So then I knocked on the door too, you know. I didn't know if there was anyone there or not. I assumed there wasn't, but I still liked to knock on the door. I knocked on the door two or three times and no one came to the door.

Q: Which gave you the impression that no one was there?

A: Right. Then I told, I hollered 'manager, maintenance man,' because I had my maintenance man with me also. And still no one came to the door, so I hollered the name again. Still no one came to the door, so I opened the door to see—

Q: Did you go in first?

A: No, sir, when I opened the door Mr. Spring passed by me, went into the apartment and opened up the refrigerator to get the bottles of formula out."

Thus Crites was in fact on her way over to "inspect" appellant's apartment when she met appellant's father and the two detectives.[4]

---

**2.** Mr. Spring, a retired postal worker after twenty eight years of service who lived in Arlington, testified to a radically different set of facts. Just after he ended his conversation with Detective Camfield, Spring watched as Crites—whom he had never seen before and did not know and, perforce, impliedly would not have approached her as manager of the apartment complex—with her maintenance man walked across the street from her own apartment, headed "straight for the door" to No. 119, unlocked it with a key, opened the door and went directly in, followed by Detective Woods. Thinking it over, Spring decided he needed the baby things and "knew if I did anything wrong the officers would see it, so I just went in and began picking up the clothes for the baby." He placed Detective Camfield by his side as they went into the apartment behind the others.

Detective Woods recalled first that Spring walked over to the apartment manager—without indicating how he or anyone else knew Crites in that capacity—followed by himself and Camfield; later, however, Woods said that Crites and the maintenance man "walked right to us," and Spring "asked who she was, and she explained she was the manager;" Spring said he wanted to pick up some baby things from his son's apartment for their baby and then "all of us walked over toward the apartment and she opened the door ... [called out 'manager and maintenance man'] and Mr. Spring went on inside the apartment and Detective Camfield ... followed Mr. Spring in." For his part, Woods says he remained at the threshold momentarily and then went in with Crites. Agreeably, Detective Camfield said that Crites went to No. 119, opened the door, called out "manager-maintenance man," and Spring promptly entered the apartment ahead of Crites, but with Camfield at his heels "to make sure he didn't upset no evidence."

**3.** All emphasis is mine throughout unless otherwise indicated.

**4.** During the hearing the State produced a lease agreement for No. 119, which was admitted in evidence, and pointed to provisions entitled "When Owner May Enter" in an effort to justify the "inspection" by Crites. However, while expressing the view that she "had a legal right to go in the apartment for inspection," Crites did not recede from her position that she was impelled by the communication from the Bedford Police Department to make it. Thus, she testified:

"Q: All right. And again, the circumstances that caused you to even be at the apartment was a telephone call from the Bedford Police Department, is that not correct?

A: Making me aware that there was a problem, because I wouldn't have known that there was a problem prior to, you know, to the phone call. I wouldn't have went there, no.

\* \* \* \* \* \*

Q: Since you were going over there anyway to look in the apartment for stolen items, or whatever reason—

A: For the inspection.

Q: —requested by the Bedford Police Department, if Mr. Spring hadn't been around, you would have gone on in because you were heading there anyway?

After Crites unlocked the door to appellant's apartment, Detective Camfield, following Spring inside, spotted what he believed to be marihuana in a container on the living room floor. Detective Woods testified:

"A: ... When she unlocked the door and pushed it open, her and Mr. Spring and Detective Camfield were all there, and I was standing toward the left side of the door. And Mr. Spring went around Mrs. Crites and Detective Camfield went with him.

Q: Okay. Now, was there some marijuana in the apartment?

A: Yes, sir.

Q: And where was that marijuana that you first saw?

A: It was in the living room on the floor directly in front of the door."

Shortly after the two detectives entered appellant's apartment and saw several items they suspected to be stolen property, they called Narcotic Officer R. L. Huling of the Fort Worth Police Department. With his partner, H. T. Wyatt, Huling arrived at the apartment at 2:00 p. m., stayed about ten minutes looked around the premises,[5] talked to the detectives, and returned to the police station, where he drafted and both officers signed the supporting affidavit for the search warrant. He then obtained a search warrant from a municipal judge directing the officers to search appellant's

apartment for marihuana, and returned to the apartment at approximately 4:30 p. m. This search warrant for marihuana was then used to search appellant's apartment, and some items subsequently seized were introduced at appellant's trial for burglary of a habitation.[6]

We now attempt to sort out the facts and apply the law. In the first place the initial intrusion into appellant's apartment occurred without a search warrant. It is well established that an invasion of privacy conducted without a warrant issued on the basis of a neutral determination of probable cause is per se unreasonable, and that the warrant requirement is subject only to a few well delineated exceptions. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The State points to none, but seeks to fashion a rule of laying siege to suspected premises. That is, without citing any authority whatsoever, the State characterizes the situation as "nothing more than a careful and routine police matter," and then selectively phrases and shades its version of the operative facts underlying the initial intrusion. Thus, the detectives are said to have been sent to appellant's apartment "to place it under surveillance *and secure it*" until Bedford police came with their warrant "to search for stolen or burglarized property;" they were doing that "until faced with the *intrusion* of Appellant's father who wanted to

---

**A: Right."**

**5.** At that time Officer Huling saw a small quantity of marihuana, presumably that which the detectives had also noticed, as well as suspected cocaine on a bar top; he also observed several items of property which he "felt probably might have been stolen," and which Detective Woods suspected had been.

**6.** The "reasonable belief" portion of the affidavit for the search warrant is appended to this opinion. In his second ground of error appellant renews the contention in ground two of his motion to suppress that the affidavit fails to meet the twoprong requirements of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) insofar as the belief of the affiants is based on the hearsay report of Detective Woods that he had received information from an informant concerning concealment of numerous stolen items in the apartment of appel-

lant, recited in paragraph 3 of the affidavit. Clearly the report fails the *Aguilar* tests. However, in overruling this ground the trial court characterized the recitation of the informer's report as "just to show the excuse for the officers to be on the scene," and on appeal the State has adopted that posture with its assertion that the search warrant was issued "by virtue of the actual knowledge of the officers having seen the contraband on the premises sought to be searched and not based on an informant's statements," so the *Aguilar* tests, says the State, are irrelevant. In essence, then, what the "detached magistrate" was asked to approve was an initial intrusion, to "secure" the apartment, followed by observation of what appeared to be marihuana. In short, the warrant and ensuing search are themselves "fruits" of that intrusion and their validity depend upon its lawfulness.

gain entrance to the apartment," according to the State. Then the State would have it:

"The manager of the apartments opened the door, *not at the request of these officers*, and the Appellant's father entered. *To maintain the integrity* of the place and its contents, one officer went in behind him, the other remained at the door. Both saw just inside the door a box of marijuana [sic] and as a result, a search warrant was obtained to allow a search of the premises ... for the marijuana [sic]."[7]

The assumption throughout this recitation is that police officers surveilling at the bare request of another law enforcement agency somehow are authorized to "secure," to "maintain the integrity" of the place being watched and its contents. Again, the State does not support that assumption with judicial precedent to that effect. We venture the thought that there is none.

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972), and "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house," *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). Neither may that threshold be reasonably crossed without a warrant by police officers, *ibid.*, nor may the locked door be opened by the landlord or his agent to permit them to do so, *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964), for "to uphold such an entry, search and seizure 'without a warrant would reduce the [Fourth] Amendment to a nullity and leave [tenants'] homes secure only in the discretion of [landlords].' *Johnson v. United States*, [333 U.S. 10] at 14 [68 S.Ct. 367, 369, 92 L.Ed. 436 (1948) ]," *Chapman v. United States*, 365 U.S. 610, 617, 81 S.Ct. 776, 780, 5 L.Ed.2d 668 (1961). Crites,

acting at the instance of the Bedford Police Department, became "an 'instrument' or agent of the state"[8] when she agreed to and went to carry out the mission assigned her, and her pretense that she was also exercising a contractual right to "inspect" the apartment is of no moment for "it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions ... [in] ... the body of private property law," and the Supreme Court has made it clear for a long time that courts "ought not to bow to them in the fair administration of the criminal law," *Jones v. United States*, 362 U.S. 257, 266–267, 80 S.Ct. 725, 733–34, 4 L.Ed.2d 697 (1960); *Chapman v. United States*, supra, 365 U.S. at 617, 81 S.Ct. at 780.

■ When police officers act to disturb a citizen's expectation of privacy at the instance of another law enforcement agency validity of their conduct depends upon whether the requesting officer had probable cause to instigate the action, and proof of what is said to constitute it must be made. *Bazan v. State*, 522 S.W.2d 224 (Tex.Cr. App.1975). Here there is no such proof of the facts and circumstances that the Bedford police officer believed amounted to probable cause to enter and search appellant's apartment. Indeed, since the mid-morning message was to effect surveillance until the Bedford police procured and arrived with a search warrant and it is apparent that they had not produced a warrant before Officer Huling returned to the municipal court to obtain one on his own, that Bedford ever put together any probable cause seems highly unlikely—at least, according to the record of the hearing on motion to suppress, the search pursuant to the warrant Officer Huling obtained at 4:20 p. m. was carried out by the four Fort Worth officers we have mentioned in this

---

7. As a matter of style this Court prefers the alternate spelling of this name used to mean a form of cannibis—marihuana.

8. See *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2042, 2029, 29 L.Ed.2d 564 (1971).

opinion.[9] Detective Woods confirmed that Bedford police never showed up with a search warrant and, he being the one who spoke with the policeman who called, answered quite candidly, "I don't know," when asked whether Bedford had "sufficient grounds to issue a warrant" to search for stolen property. Finally, as the State itself points out from the record, "[I]t must be remembered that these [Fort Worth] officers had not the slightest idea of what objects might have been stolen or from whom."

Crites, acting as she was at the behest of the Bedford Police Department, stands on no better footing.

■ Given these considerations, we decline to approve the notion that police officers conducting a surveillance at the request of a police officer in another jurisdiction, who merely suspects that stolen property might be cached in an apartment have the power and authority to "secure" or to "maintain the integrity of the place and its contents," when they are without "the slightest idea" of what property within might have been stolen.

Together, Crites, Woods and Camfield subjected appellant to a deprivation of his reasonable expectation of privacy, contrary to the constitutional safeguards against arbitrary invasion by governmental officials and those acting as their instrument or agent. See generally *Kolb v. State*, 532 S.W.2d 87, 89, 91 (Tex.Cr.App.1976); *Chambers v. State*, 508 S.W.2d 348, 351–352 (Tex. Cr.App.1974); cf. *Bodde v. State*, 568 S.W.2d 344, 352–353 (Tex.Cr.App.1978).

**9.** Meanwhile they made themselves at home. Thus Woods testified:

"Q: But instead, you went on in the apartment, you and Camfield, is that right?
A: Yes, Camfield, the apartment manager and Mr. Spring.
Q: In fact during the course of the evening, you made yourself at home in that apartment, didn't you?
A: Yes. We stayed in the apartment.
Q: In fact, you kind of made yourself at home?
A: How do you mean? I sat down.
Q: You got a pizza and ate a piece in the apartment?

The judgment of conviction is reversed and the cause remanded.

DALLY, J., concurs in result.

### APPENDIX

"Our beliefs are based on the following facts and circumstances:

1. On Monday, December 12, 1977, at approximately 1:15 p.m., affiants received a call from Fort Worth Police Detective R. E. Woods, requesting that affiants meet Detective Woods at 2120 Handley Drive, Apartment # 119.

2. Affiants proceeded to the aforementioned address and met with Detective Woods inside Apartment # 119.

3. Detective Woods told affiants that *he had received information from an informant* that Raymond Duane Spring, W/M, 8–25–50, 6'1", 190 pounds, medium length brown hair, was living at the aforementioned address and that Spring was concealing numerous stolen items in the apartment. Woods also stated that he had talked with and gained the information from this informant within the last eight (8) hours. Woods stated that the informant had told him (Woods) that Spring was in the Bedford City Jail after being arrested on 12–12–77, (early morning) for burglary.

4. Woods stated that he had confirmed with Bedford Police Department, that Spring was indeed in their jail for Burglary.

A: Yes, sir. I missed lunch.
Q: Without a warrant, you walk in a man's house, sit down and eat a pizza in his house?
A: Yes, sir.
Q: When the purpose you were there for was to keep evidence from being taken out of that apartment?
A: Correct.
Q: That could have been easily done being parked out in front of it and preventing anybody from going in the apartment, is that not correct?
A: Yes, sir."

5. Woods stated that after receiving this information, he proceeded to 2120 Handley Drive to set up surveillance on apartment 119. Woods stated that this was done so that he could make sure that no property was removed from the apartment before Spring was released from the Bedford City Jail, or before a Fort Worth Detective could talk with Spring about the stolen property.

6. Woods stated that while he was watching the apartment, a W/M and a W/F came to the front door of the apartment, opened the door, and entered. Detective Woods stated that he went up to the front door (which was left opened) and noticed the W/M and W/F inside the apartment. Detective Woods stated that he immediately observed a pan, setting in the living room portion of the residence, which contained a green plant substance, which appeared to be marijuana. Detective Woods stated that he talked with the W/M and found him to be Spring's father. The W/F was identified as the apartment manager.

7. After this, Woods called for Narcotic Officers and secured the apartment until a Search Warrant could be obtained."